STATE of Utah, Plaintiff and Appellee,

v.

Tomas R. HERRERA, Defendant
and Appellant.

STATE of Utah, Plaintiff and Appellee,

v.

Mikell SWEEZEY, Defendant
and Appellant.

Nos. 920209, 920265.

Supreme Court of Utah.

April 21, 1995.

R. Paul Van Dam, Atty. Gen., Christine Soltis, Asst. Atty. Gen., Salt Lake City, for plaintiff.

Joan C. Watt, Mark R. Moffat, Richard P. Mauro, Salt Lake City, for Herrera.

Lisa J. Remal, Joan C. Watt, Salt Lake City, for Sweezey.

HOWE, Justice:

This is an appeal from two interlocutory orders entered in two cases which we have consolidated for appellate purposes. Defendants Tomas R. Herrera and Mikell Sweezey both challenge the constitutionality of Utah's insanity defense as codified under Utah Code Ann. § 76–2–305 and other related sections.

## FACTS

Since this is an interlocutory appeal, there has been only limited adjudication of the specific facts in either case. The State concedes the following facts only so far as the limited issue of constitutionality is concerned.

### State v. Herrera

Defendant Herrera shot and killed his ex-girlfriend, Claudia Martinez. He admitted to the police that he had been visiting "some girl" when "something snapped, something happened to him and he decided to go to the Martinez house and shoot Claudia." He also admitted that he took his gun to her home and shot her twice in the head. He then chased her mother, Rosa Gonzales, into a bedroom where Claudia's brother, Reuben Martinez, was sleeping. Herrera shot at both of them but missed. The police arrested Herrera shortly after the killing while he still had possession of the gun. He had not consumed any alcohol or drugs. He was charged with Claudia's murder and with the attempted murder of the other two, all in violation of Utah Code Ann. § 76–5–203.

Herrera eventually pleaded not guilty by reason of insanity. He filed several motions attacking Utah's statutory scheme as unconstitutional. The trial court upheld the insanity defense statutes, and Herrera petitioned for this interlocutory appeal.

### State v. Sweezey

Steve Matthews was standing outside a hotel in downtown Salt Lake City when Sweezey approached. When Sweezey was within about eight feet, he pulled a gun from his backpack and shot Matthews in the face. The bullet entered Matthews's left cheek but did not kill him. A security officer of the hotel heard Sweezey say, "They wrecked my home so I shot him." Sweezey was charged with attempted murder in violation of Utah Code Ann. § 76–5–203.

Sweezey also filed several motions that are essentially identical to those filed by Herrera, attacking Utah's insanity defense statutes. The trial court denied these motions, and we granted Sweezey's interlocutory appeal.

## STANDING ISSUES

■ Initially, there is a question whether either Herrera or Sweezey, at this early stage, has demonstrated that he has standing to challenge the statutes. However, it is an adequate showing of standing if an expert provides testimony or an affidavit asserting that a "viable issue of insanity" is involved in the case. *State v. Rhoades*, 119 Idaho 594, 809 P.2d 455, 459–60 (1991). Both Herrera and Sweezey presented such testimony, and we conclude that they have standing to bring this challenge.

## ANALYSIS

### I. Background

■ When John Hinckley was found not guilty by reason of insanity for shooting President Ronald Reagan and Press Secretary James Brady, public outrage prompted Congress and some states to reexamine their respective insanity defense laws. As a result, in 1983 Utah abolished the traditional insanity defense in favor of a new statutory scheme. *State v. Young*, 853 P.2d 327, 383 (Utah 1993); *Utah Legislative Survey*, 1984 Utah L.Rev. 115, 151. Under Utah's current scheme:

> It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness is not otherwise a defense.

Utah Code Ann. § 76–2–305(1). This amendment eradicated the prior law, which allowed a defendant to present an independent affirmative defense of insanity. In other words, the former statute permitted a defendant to defend on the ground that he or she commit-

ted the act but did not understand that the act was wrong. The new law limits the defense to simply that the defendant did not have the requisite mens rea of the alleged crime. *Young,* 853 P.2d at 384.

A common example is helpful to illustrate the difference between the prior law and the new law. If A kills B, thinking that he is merely squeezing a grapefruit, A does not have the requisite mens rea for murder and would be acquitted under both the prior and the new law. *See* Wayne R. LaFave, *Substantive Criminal Law* 306, 315 (1987) (citing Model Penal Code § 4.01 cmt., at 166 (1985)) [hereinafter LaFave]. However, if A kills B, thinking that B is an enemy soldier and that the killing is justified as self-defense, then A has the requisite mens rea for murder and could be convicted under the new law but not under the prior law, because he knowingly and intentionally took another's life. Under the amended provision, it does not matter whether A understood that the act was wrong. *See* Loren R. Roth, *Tighten But Do Not Discard* JAMA 2947–48 (June 8, 1984) (American Psychiatric Association analyzing mens rea approach to insanity defense); Wallace D. Riley, *Reform Not Abolition,* JAMA 2949 (June 8, 1984) (American Bar Association analyzing mens rea approach to insanity defense). The new law does away with the traditional affirmative insanity defense that the killing was perceived to be justifiable and therefore done with innocent intent. We will refer to the amended version as the mens rea model. *See* Harlow M. Huckabee, *Avoiding the Insanity Defense Straight Jacket: The Mens Rea Route,* 15 Pepp.L.Rev. 1, 25 (1987) [hereinafter Huckabee].

### II. Legislative Responsibility

Determining accountability for criminal acts is a serious and difficult task. Government must balance society's interests in order, protection, punishment, and deterrence with the particularly arduous responsibility of caring for the insane and mentally deficient. In formulating an insanity defense, government must carry out the demands of punishment and at the same time assure that those without guilty minds are not unjustly condemned. As one state supreme court justice observed, "In a very real sense, the confinement of the insane is the punishment of the innocent; the release of the insane is the punishment of society." *State v. Stacy,* 601 S.W.2d 696, 704 (Tenn.1980) (Henry, J., dissenting).

This delicate balancing of public policy is better accomplished in the legislature than in the courts. United States Supreme Court Justice Black, dealing with the nebulous concepts of compulsion and mental disease, stated, "The range of problems created would seem totally beyond our capacity to settle at all, much less to settle wisely, and even the attempt to define these terms and thus to impose constitutional and doctrinal rigidity seems absurd in an area where our understanding is even today so incomplete." *Powell v. Texas,* 392 U.S. 514, 546, 88 S.Ct. 2145, 2161, 20 L.Ed.2d 1254 (1968) (Black, J., concurring). We made it very clear in *Bastian v. King,* 661 P.2d 953, 956 (Utah 1983), that "[i]t is the power and responsibility of the Legislature to enact laws to promote the public health, safety, morals and general welfare of society ... and this Court will not substitute our judgment for that of the Legislature with respect to what best serves the public interest." (Citation omitted.) This sound policy of judicial restraint applies all the more when determining the culpability of the mentally ill. " 'It is not the function of this Court to evaluate the wisdom or practical necessity of legislative enactments.' " *Id.* (quoting *Redwood Gym v. Salt Lake County Comm'n,* 624 P.2d 1138, 1141 (Utah 1981)); *see Sullivan v. Scoular Grain Co. of Utah,* 853 P.2d 877, 883 (Utah 1993) ("We are not free 'to assess the wisdom of a statutory scheme.' " (quoting *West Jordan v. Morrison,* 656 P.2d 445, 446 (Utah 1982))).

■ Even if a court finds certain legislation unreasonable or unwise, that alone does not mean it has authority to invalidate it. *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985). The law must first rise to the level of violating the constitution before it can be stricken. In this instance, our role is to make such a constitutional evaluation, not to generally critique the legislation.

 We emphasize the basic rule of construction that these statutes must be construed, if possible, as being in compliance with both federal and state constitutions. *Nelson v. Miller,* 25 Utah 2d 277, 282–83, 480 P.2d 467, 471–72 (1971). " 'In order to preserve the independence and the integrity of the three branches of government, it is of the utmost importance that the judicial exercise restraint and not intrude into the legislative prerogative.' " *Id.,* 480 P.2d at 472 (quoting *Trade Comm'n v. Skaggs Drug Ctrs., Inc.,* 21 Utah 2d 431, 437, 446 P.2d 958, 962 (1968)). There is no doubt that we cannot strike down any legislation unless it expressly violates the constitution or it is clearly prohibited by "some plain mandate thereof." *Id.; Parkinson v. Watson,* 4 Utah 2d 191, 197, 291 P.2d 400, 403–04 (1955); *see Trade Comm'n,* 446 P.2d at 963 (stressing that courts are called upon to state what the law is and not what they think it should be; courts are not the conscience of the people and are not to "express the personal desires or philosophy of its personnel").

### III. Federal Due Process Concerns

Defendants argue that the Utah mens rea model violates federal due process because a defendant cannot "rely on insanity as a basis for nonresponsibility for the crime unless he suffers from a form of insanity which serves to negate the mens rea element of the crime." Admittedly, this amended statute limits the insanity defense to a very narrow class of extremely mentally ill defendants. Defendants maintain that since they already have the opportunity to negate the statutorily required mens rea element of a crime and since the State must prove every element

beyond a reasonable doubt, the traditional affirmative defense of insanity is no longer available. Its absence, they argue, offends the basic concept of "ordered liberty" protected by the Due Process Clause. *See Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), *abandoned by Teague v. Lane,* 489 U.S. 288, 311–13, 109 S.Ct. 1060, 1075–77, 103 L.Ed.2d 334 (1989). Basically, defendants see Utah's mens rea model as unconstitutional because it would allow them to be convicted even if they did not consciously know the wrongfulness of their actions. As a means to reach their desired conclusion, defendants urge us to establish a combination of the M'Naghten test and the irresistible impulse rule as a minimum requirement of federal due process.[1]

Only Utah, Idaho, and Montana have limited the insanity defense to negating the mens rea of a crime.[2] The Supreme Courts of Idaho and Montana have already upheld the insanity defense statutes in those states as constitutional under the federal constitution. *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990); *State v. Korell,* 213 Mont. 316, 690 P.2d 992 (1984); *see also State v. Byers,* 261 Mont. 17, 861 P.2d 860 (1993); *State v. Cowan,* 260 Mont. 510, 861 P.2d 884 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1371, 128 L.Ed.2d 48 (1994). Although the statutes of these three states are not identical, they are very similar. *See* Idaho Code § 18–207; Montana Code Ann. §§ 46–14–102, –201 to –203, –212 to –213.

In *Searcy,* the Idaho Supreme Court reviewed the state's insanity defense under both state and federal due process clauses.

---

**1.** The M'Naghten test has become the predominant insanity test throughout the United States. Although variations of the test exist, it is basically defined as follows:

[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it that he did not know what he was doing was wrong.

LaFave, at 311. For purposes of this analysis, we acknowledge that the mens rea model abolishes the second prong of the M'Naghten test,

i.e., that the defendant understood the wrongfulness of his conduct.

In broad terms, the irresistible impulse test requires a verdict of not guilty by reason of insanity if it is found that the defendant had a mental disease which kept him from controlling his conduct. *Id.* at 320.

**2.** The Alaska Supreme Court concluded that Alaska's statutory insanity defense incorporated only the first prong of the M'Naghten test. *State v. Patterson,* 740 P.2d 944, 947 (Alaska 1987). However, the court refused to comment on its constitutional validity at that time. *Id.* at 949 n. 18.

Defendant Searcy argued that the Idaho law unconstitutionally denied him due process of law because it prevented him from pleading insanity as a defense. The court concluded, "Neither the federal nor the state Constitution[ ] contains any language setting forth any such right." *Searcy*, 798 P.2d at 916.

■ *Searcy* clarified the actual effect of limiting the insanity defense to negating mens rea. The court explained that only

> [t]hree states, Idaho, Montana and Utah, have legislatively chosen to reject mental condition as a separate specific defense to a criminal charge. The statutes in these three states, however, expressly permit evidence of mental illness or disability to be presented at trial, not in support of an independent insanity defense, but rather in order to permit the accused to rebut the state's evidence offered to prove that the defendant had the requisite criminal intent or mens rea. . . .

*Id.* at 917. We agree with this characterization of the current Utah mens rea model. Although Utah law does not recognize as a defense that defendants did not understand the wrongfulness of their conduct, as would be allowed under an affirmative insanity defense, it still allows them to introduce rebuttal evidence that they lacked the requisite mens rea due to their mental illness.

The United States Supreme Court has never squarely addressed whether due process demands an affirmative insanity defense, *id.* at 918; neither has that Court articulated a constitutional definition of insanity. *Abbott v. Cunningham*, 766 F.Supp. 1218, 1223 (D.N.H.1991). However, what little the United States Supreme Court has said suggests that there is no federal due process right to an independent defense of insanity. *Searcy*, 798 P.2d at 918. In *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the United States Supreme Court upheld an Oregon statute that placed the burden of proving insanity beyond a reasonable doubt on the defendant. The Court declined to adopt any specific insanity test as a requirement under federal due process, concluding that such a holding would be unwarranted given the uncertainty in the psychiatric community, the erratic history of the insanity defense, and the fact that most jurisdictions used a "[k]nowledge of right and wrong" test. *Id.* at 800, 72 S.Ct. at 1008.

Defendants argue that this means a state is free to choose one test over another but is not permitted under the constitution to reject all of the traditional tests and apply a mens rea model. We cannot accept such a narrow reading of *Leland*. The very thrust of the Court's holding is that the law does not demand any particular approach to the insanity defense. We read *Leland* to allow the states some experimentation with various approaches of dealing with the insane criminal defendant. *See Byers*, 861 P.2d at 866 (noting that United States Supreme Court has determined that Due Process Clause does not require use of any particular insanity defense).

In *Powell*, 392 U.S. at 535, 88 S.Ct. at 2155, the United States Supreme Court upheld a state law which made it unlawful to be drunk in a public place. In the lead opinion, Justice Marshall set forth the complexities of dealing with personal accountability in the law:

> We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.

*Id.* at 535–36, 88 S.Ct. at 2156. The opinion also echoed the reluctance found in *Leland* to establish a constitutional right to any particular insanity defense:

> But formulating a constitutional rule would reduce, if not eliminate, that fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. It is simply not yet the time to write into the

Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers.

*Id.* at 536–37, 88 S.Ct. at 2156. We agree with these rationales. We are reluctant to embrace any one test, including a combination of M'Naghten and the irresistible impulse test, as the constitutional minimum requirement.

The United States Supreme Court struck down a state statute which allowed continued confinement of one who exhibited antisocial activity but was no longer found mentally ill. *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). On an uncontested point, Justice Kennedy acknowledged, "States are free to recognize and define the insanity defense as they see fit." *Id.* at 96, 112 S.Ct. at 1794 (Kennedy, J., dissenting). In a concurring opinion, Justice O'Connor emphasized that the Court's holding placed no new restriction on the "States' freedom to determine whether and to what extent mental illness should excuse criminal behavior. The Court does not indicate that States must make the insanity defense available." *Id.* at 88–89, 112 S.Ct. at 1790 (O'Connor, J., concurring); *see Ake v. Oklahoma,* 470 U.S. 68, 91, 105 S.Ct. 1087, 1100, 84 L.Ed.2d 53 (1985) (Rehnquist, J., dissenting) ("It is highly doubtful that due process requires a State to make available an insanity defense to a criminal defendant.").

Defendants make a historical argument that an affirmative independent insanity defense is so grounded in our legal system that its abolishment offends our fundamental principles of law and justice and therefore violates due process.[3] *Searcy* addressed a similar argument and recognized that "[t]he insanity defense has had a long and varied history during its development in the common law." 798 P.2d at 916–17. However, it also recognized that this history has not been uniform and that over the centuries, the implications of a criminal defendant's insanity have changed. *Id.* at 917. Many different theories have surfaced, been discarded, and resurfaced as humanity has attempted to deal with the elusive concepts of mental illness and guilt. "Not surprisingly, there has resulted a wide disparity in the position taken on this issue both by legislatures and courts in the various states." *Id.*

For example, although the states have taken two basic approaches to insanity, several variations of different rules exist. A majority of states follow some form of the M'Naghten test; others have adopted variations of the Model Penal Code definition. Six states have added the "irresistible impulse" test, and three states now use the mens rea model. Kathryn J. Fritz, *Proposed Federal Insanity Defense: Should the Quality of Mercy Suffer for the Sake of Safety?,* 22 Am.Crim.L.Rev. 49, 52–53 (1984); *see* LaFave, at 310. Never has one approach been constitutionally required or universally deemed the best. Rather, jurisdictions have developed individualized systems that best serve their own public policies.

Although Utah has adopted a minority position, its approach has been endorsed by credible branches in the scientific and medical fields. In 1983, the American Medical Association approved a report by its Board of Trustees recommending adoption of the mens rea model. Committee Report, *Insanity Defense in Criminal Trials and Limitation of Psychiatric Testimony,* JAMA 2967 (June 8, 1984) (making an adamant argument in support of this position) [hereinafter AMA Report]. "Thus, [the mens rea model] is now the policy of the American Medical Association, as well as the concept adopted in Idaho, Montana, and Utah." Huckabee, at 26–27.

■ The Montana high court has also determined that there is no constitutional right to have an independent insanity defense. *Korell,* 690 P.2d at 996. There, the court responded to the historical argument as follows: "We reject appellant's contention that from the earliest period of the common law, insanity has been recognized as a defense. What we recognize is that one who lacks the requisite criminal state of mind may not be

---

3. Defendants' briefs include an extensive review of the insanity defense. Their argument begins with sixth century B.C. Hebrew law, proceeds through the establishment of the United States Constitution, and continues through American case law until the present.

convicted or punished." *Id.* at 999.[4] Utah's mens rea model provides this minimum standard of protection to defendants. We agree with *Korell* that the common law and our basic principles of ordered liberty are not offended by the mens rea model. *See also Cowan,* 861 P.2d at 888 (holding that the Due Process Clause does not require the use of any particular insanity test or allocation of burden of proof).

Defendants rely upon three dated state decisions which struck down their respective state statutes as unconstitutional because they abolished the insanity defense completely. *State v. Lange,* 168 La. 958, 123 So. 639 (1929); *Sinclair v. State,* 161 Miss. 142, 132 So. 581 (1931); *State v. Strasburg,* 60 Wash. 106, 110 P. 1020 (1910). These cases are distinguishable because they involved "statutes which precluded any trial testimony of mental condition, including trial testimony which would have rebutted the state's evidence of the defendant's state of mind." *Searcy,* 798 P.2d at 919 n. 6. Utah's law does not do this. Rather, it allows defendants to present evidence of mental illness to specifically negate the required state of mind.

Determining whether a law is wise public policy and determining whether it is constitutional are two separate matters. It is appropriate for this court to decide only the latter, and in light of the foregoing discussion, we conclude that the current Utah insanity defense does not violate federal due process.

### IV. State Due Process Concerns

Defendants next contend that Utah's statutory scheme violates due process under the state constitution. Utah Const. art. I, § 7 ("No person shall be deprived of life, liberty or property, without due process of law.").

Defendants provide a detailed history of how Utah has been a pioneer in the treatment of the insane and mentally ill. From its territorial days to 1983, Utah has demonstrated extraordinary compassion and insight in dealing with this class of society. Salt Lake City had the first institution for the mentally ill in the western United States. Charles R. McKell, *History of the Utah State Hospital, Provo (1948)* (unpublished Master's thesis, University of Utah). Territorial law made it a misdemeanor to harshly treat or neglect any insane person. 1876 Utah Laws ch. XI, § 193. Throughout most of its history, Utah had one of the most liberal statutory approaches governing the culpability of those with mental illness. *State v. Kirkham,* 7 Utah 2d 108, 111, 319 P.2d 859, 861 (1958). Because of this unique history, defendants assert that the state due process protection exceeds that of its federal counterpart, at least as far as the insanity defense is concerned. Defendants argue, therefore, that the state due process clause prohibits abolishment of the traditional affirmative insanity defense. We disagree.

Defendants' reliance upon this history is misplaced. It is one thing to demonstrate that Utah has a unique background in dealing with mental illness; it is quite another to conclude that state due process must comply with this background and that any legislation that abandons Utah's historical practices violates the constitution. The legislature is allowed to reform the penal law; it is not locked into the past. As the State explains in its brief, "[D]efendant [does not] have a vested right to a defense simply because it was previously available." *See State v. Padilla,* 776 P.2d 1329, 1331 (Utah 1989) (stating that a similar argument relying on outdated criminal law was frivolous).

In any event, Utah's history has not been a model of consistency in the area of the insanity defense. The state has employed different approaches at different times over the past one hundred years. The irresistible impulse test, for example, was initially rejected, *State v. Mewhinney,* 43 Utah 135, 149, 134 P. 632, 638 (1913), was later recognized,

---

4. In fact, the insanity defense is not as deeply anchored in history as some might imagine.... [I]nsanity did not come to be recognized as an independent ground for exculpation until the 19th century. Prior to that time, insanity was considered relevant to the issue of guilt, or moral blameworthiness only insofar as it bore upon *mens rea.* Creation of the special defense was a departure from the traditional moral basis of the criminal law—embodied in the concept of *mens rea*—that had prevailed for centuries before.

AMA Report, at 2977.

*State v. Green,* 78 Utah 580, 602, 6 P.2d 177, 185 (1931), and was then rejected again. *State v. Sessions,* 645 P.2d 643, 645 (Utah 1982). Utah has sampled several variations over the years, demonstrating the somewhat erratic nature of the relationship between criminal culpability and insanity.

Defendants also rely upon past decisions of this court to support their state due process argument. *See, e.g., Mewhinney,* 134 P. at 638 (implementing insanity test requiring defendant to recognize wrongfulness of conduct); *State v. Brown,* 36 Utah 46, 102 P. 641 (1909) (recognizing that an individual could have the necessary mens rea but not be criminally culpable due to insanity). These cases are distinguishable. This court decided them prior to 1983, when the legislature limited the insanity defense. These former decisions either interpreted a different statutory standard that existed at that time or simply expressed a judicial preference for one test over another. None of the cases are grounded in the Utah constitution, and they are not binding today in light of section 76–2–305. *See Korell,* 690 P.2d at 999–1000.

The Utah legislature has made a policy decision to limit the traditional insanity defense. We hold that this policy decision, though limiting for defendants, does not violate their state due process rights.

Although the legislature has limited the insanity defense, it has provided the guilty and mentally ill verdict as an option. "A judgment of guilty and mentally ill does not serve to exonerate or excuse the defendant; rather, the offender found guilty and mentally ill is held accountable for his criminal conduct, yet because of his mental illness, may need specialized treatment." *State v. DePlonty,* 749 P.2d 621, 626 (Utah 1987). "Guilty and mentally ill" is a deliberate variation of the "guilty *but* mentally ill" provision adopted by some states. The [Utah] legislative committee thought that the words "guilty but mentally ill" implied a causal connection between the mental illness and the crime. That implied connection, however, is inappropriate under the Utah statute because "guilty and mentally ill" *focuses on the defendant's state of mind at the time of sentencing, regardless of his state of mind at the time of the crime.*

*Young,* 853 P.2d at 384 (quoting *Utah Legislative Survey—1983,* 1984 Utah L.Rev. 115, 156 n. 265); *see* Utah Code Ann. §§ 77–16a–103, –104. If a defendant is found not guilty by reason of insanity, he is acquitted of all criminal culpability. However, he is subject to civil confinement. If a defendant is found guilty and mentally ill, the trial court first conducts a hearing to "determine the defendant's present mental state." § 77–16a–104(1). If the court "finds by clear and convincing evidence that the defendant is currently mentally ill," it may sentence the defendant just as any other guilty defendant and (1) commit him to the state hospital, (2) order probation, or (3) order him to the custody of the Department of Corrections. § 77–16a–104(3). If a defendant is committed to the state hospital for confinement and treatment, he remains there for eighteen months or until he reaches "maximum benefit." § 77–16a–202(1)(b).

The guilty and mentally ill verdict buffers some of the harsher consequences of eliminating an independent insanity defense. It affords the trial judge discretion in determining whether one found guilty and mentally ill should receive medical attention rather than traditional incarceration. This new verdict option acknowledges that a defendant can be both guilty and mentally ill, and it aids the jury in resolving the dilemma of whether to acquit due to insanity. The verdict provides a middle ground between "guilty" and "not guilty by reason of insanity." It allows for "special disposition of mentally ill offenders to a custodial or therapeutic setting for the purpose of treating the mental illness." *Utah Legislative Survey—1983,* 1984 Utah L.Rev. at 156–57.

Defendants argue that Utah's approach has thrown hundreds of years of development out the door. Existence of the guilty and mentally ill verdict contradicts such assertions. We believe that the mens rea model coupled with this inventive verdict is a constitutionally valid system of dealing with an ever-adapting field. The new law is not a digression to ages of ignorance and fear of mental illness, but a legitimate approach to

dealing with the sometimes baffling relationship between insanity and mens rea. *See* AMA Report, at 2976 (concluding that mens rea approach surpasses, both legally and morally, all traditional insanity defenses while it leads to "a more realistic appreciation of the relationship between mental impairment and criminal behavior").

## V. Burden of Proof

■ For defendants to be convicted, due process mandates that the prosecution prove every element of the charged crimes beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *State v. Swenson*, 838 P.2d 1136, 1138 (Utah 1992). Defendants assert that the Utah insanity defense scheme unconstitutionally relieves the prosecution of this burden in violation of due process.[5] They contend that since section 76–2–305 allows them to rely on insanity only to negate the required intent, an element of the crime, in essence they are forced to prove that they lacked the requisite mens rea rather than the prosecution proving that they possess it. If true, this would shift the burden of proof.

■ This theory has previously been considered and rejected. In *Byers*, 861 P.2d at 864–65, the court explained that the mens rea model enables a defendant to present evidence supporting his insanity claim but does not require the defendant to prove beyond a reasonable doubt that his disease negates the requisite intent. "When a burden 'shifts' it goes from one party to another, from prosecution to defendant. But the prosecution here was not relieved of its burden. The jury was not instructed that [the defendant] had any kind of burden at all." *Id.* at 865; *State v. Beam*, 109 Idaho 616, 710 P.2d 526, 531 (1985).

Section 76–2–305 does not shift any burden of proof. It merely enables defendants to present evidence that rebuts the State's case against them. From beginning to end, the prosecution carries the responsibility of proving each and every element of the crime beyond a reasonable doubt.

## VI. Arbitrary and Capricious and Equal Protection

■ The next issue to address is whether section 76–2–305 is arbitrary and capricious and therefore violative of state due process, Utah Const. art. I, § 7, or federal and state equal protection, U.S. Const. amend. XIV, Utah Const. art. I, § 24. Both the federal and state constitutions require that similarly situated individuals be treated alike under the law unless there is a reasonable basis for treating them differently. *Greenwood v. City of North Salt Lake*, 817 P.2d 816, 821 (Utah 1991); *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984). Defendants argue that Utah's mens rea model illegally differentiates between mentally ill defendants solely on the content of their delusions. One insane defendant may kill under the severe delusion that he is killing something that is not human. Another may kill under a delusion that he is being attacked and that his actions are justified as self-defense. The first is found not guilty by reason of insanity under the mens rea model, while the second may be convicted. According to defendants, each is equally mentally ill, but they are treated differently because some "clinically indistinguishable delusional system" causes them to have different hallucinations.

■ We find that there is a reasonable basis for this difference and that the mens rea model is not arbitrary and capricious.[6] The legislature has drawn a line between those who do not comprehend that they are

---

5. Defendants urge us to decide this issue on both federal and state due process grounds. However, defendants' state due process argument on this specific question entails only a superficial statement concerning Utah's unique history and reference to another part of defendants' brief. Without adequate briefing and authority, we limit our analysis of the burden of proof issue to federal due process. *State v. Jensen*, 818 P.2d 551, 552 n. 2 (Utah 1991).

6. Apparently, the American Medical Association views the mens rea model as anything but arbitrary and capricious. It unambiguously attests that this approach "restores a *consistent* philosophy of criminal responsibility, thus enhancing the credibility and acceptance of the criminal justice system.... [It] emphasiz[es] considerations of mercy and appropriate treatment of *all* mentally disordered offenders." AMA Report, at 2976 (emphasis added).

taking a human life and those who do. The offenders in the first group do not know that they are hurting or killing another person, while those in the second group do know. The first group makes no moral judgment, while the second group realizes that they are actually killing someone and therefore their actions come closer to the realm of criminality. *See* AMA Report, at 2975 ("[T]he law must first discard the notion that insanity short of that which negates *mens rea* absolves a defendant of moral and legal responsibility for his acts."); *see also State v. Neely,* 112 N.M. 702, 819 P.2d 249, 255 (1991) (upholding legislative distinction between those found not guilty by reason of insanity and those found guilty but mentally ill and explaining that this classification "is rationally related to a legitimate interest—it allows those mentally ill who did not have the capacity to form the appropriate criminal intent to avoid criminal liability while providing for criminal liability for those guilty because they possessed the criminal intent, yet who are nonetheless mentally ill").

It can be reasonably concluded that those who understand and appreciate the fact that they are killing another are more "culpable" than those whose delusions carry them even further away from reality. We agree with the trial court's conclusion that "the legal standard of mental illness for purposes of criminal culpability is not constitutionally required to embrace all medical definitions of mental illness." The mens rea model is a legitimate means to the end of holding responsible those persons who acted with the necessary intent.

## VII. Right Against Self–Incrimination

Defendants charge that Utah Code Ann. § 77–14–4 violates both the federal and state constitutional rights against self-incrimination. This statute provides in part:

(1) If a defendant proposes to offer evidence that he is not guilty as a result of insanity or that he had diminished mental capacity, he shall file and serve the prosecuting attorney with written notice of his intention to claim the defense at the time of arraignment or as soon afterward as practicable, but not fewer than 30 days before the trial.

(2) If the court receives notice that a defendant intends to claim that he is not guilty by reason of insanity or that he had diminished mental capacity, the court shall order the Department of Human Services to examine the defendant and investigate his mental condition. The person or organization directed by the department to conduct the examination shall testify at the request of the court or either party in any proceeding in which the testimony is otherwise admissible. Pending trial, unless the court or the executive director directs otherwise, the defendant shall be retained in the same custody or status he was in at the time the examination was ordered.

(3) The defendant shall make himself available and fully cooperate in the examination by the department and any other independent examiners for the defense and the prosecuting attorney. If the defendant fails to make himself available and fully cooperate, and that failure is established to the satisfaction of the court at a hearing prior to trial, the defendant is barred from presenting expert testimony relating to his defense of mental illness at the trial of the case. The department shall complete the examination within 30 days after the court's order and shall prepare and provide to the court prosecutor and defense counsel a written report concerning the condition of the defendant.

Utah Code Ann. § 77–14–4(1), (2), & (3).[7] In the trial court, defendants argued that this examination requirement compels them to

---

7. Since this case reached appeal, the legislature has added some related requirements:

(3) If the prosecution or the defense proposes to introduce testimony of an expert which is based upon personal contact, interview, observation, or psychological testing of the defendant, testimony of an expert involving a mental diagnosis of the defendant, or testimony of an expert that the defendant does or does not fit a psychological or sociological profile, the opposing party shall have a corresponding right to have its own expert examine and evaluate the defendant.

. . . .

(6) This section may not require the admission of evidence not otherwise admissible.

Utah Code Ann. § 77–14–3(3) & (6).

give evidence against themselves. Both trial courts upheld this provision, and defendant Herrera was ordered to undergo the examination.

This issue of whether compelled mental examinations violate the right against self-incrimination has received much discussion. *See* LaFave, at 347 n. 55. In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the United States Supreme Court held that it violates the Fifth Amendment right against self-incrimination to compel a criminal defendant to undergo a psychiatric examination *when that defendant neither initiated nor attempted to introduce any psychiatric evidence. Id.* at 468, 101 S.Ct. at 1876; *see also United States v. Madrid,* 673 F.2d 1114, 1121 (10th Cir.1982); *State v. Bishop,* 753 P.2d 439, 473–74 (Utah 1988). The Court went out of its way to make this point clear:

> Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence [meaning his unwillingness to submit to an examination] may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

*Estelle,* 451 U.S. at 465, 101 S.Ct. at 1874 (citations omitted); *see also Buchanan v. Kentucky,* 483 U.S. 402, 422, 107 S.Ct. 2906, 2917, 97 L.Ed.2d 336 (1987) (explaining that right against self-incrimination does not preclude prosecutor, in order to rebut insanity defense, from introducing psychiatric testimony of expert who examined defendant); LaFave, at 349.

■ Defendants maintain that since their insanity defense is limited to negating the mens rea and they are no longer afforded the traditional affirmative defense, this dictum in *Estelle* is inapplicable. We disagree. The reasoning behind the above statement is to preserve a fair balance between the criminal defendant and the prosecutor. Such reasoning does not change because a state uses the mens rea model. If the defendants were permitted to rebut the state's case by pleading insanity and then to be shielded from any state psychiatric examination, the state's burden of proving they possessed the requisite mental intent beyond a reasonable doubt would become practically insurmountable. *See* LaFave, at 349–50. "It certainly would be strange doctrine to permit one charged with a public offense to put in issue his want of mental capacity to commit the offense, and in order to make his plea of want of capacity invulnerable prevent all inquiry into his mental state or condition." *State v. Cerar,* 60 Utah 208, 220, 207 P. 597, 602 (1922).

■ It is necessary, however, to include a procedural safeguard in relation to this statute. Any incriminating admissions that result from a section 77–14–4 examination should be limited to rebutting an insanity defense and may not be used to show that the defendant "engaged in the conduct charged (e.g. 'yes, I shot him')." LaFave, at 348. It is generally agreed that the privilege extends to such admissions. *Id.; see American Fork City v. Crosgrove,* 701 P.2d 1069, 1071 (Utah 1985) (discussing the subtle ways in which states may unconstitutionally compel evidence). Therefore, we direct that the prosecution may use the information from this examination only to rebut the defendants' insanity claims but not to otherwise establish guilt. The jury should be instructed about this restriction and that they should not consider any such admissions on the issue of guilt. LaFave, at 348; *see Madrid,* 673 F.2d at 1121–22. We also agree with the trial court's announced intention to proceed with an in camera review of the information before it is presented to the jury.

■ The Fifth Amendment to the United States Constitution states in part that no person "shall be compelled in any criminal case to be a witness against himself." Utah's counterpart is article I, section 12 of the Utah Constitution, which provides, "The accused shall not be compelled to give evidence against himself." Defendants argue that the state privilege against self-incrimination pro-

vides more protection to them than its federal counterpart. They base this argument on the language disparity and on Utah's history. We disagree. As we discussed in *American Fork*, 701 P.2d at 1073, Utah's privilege against self-incrimination does not exceed that of the federal constitution.

Since defendants have pleaded not guilty by reason of insanity, we conclude that the privileges against self-incrimination under both state and federal constitutions do not extend so far as to protect them from a section 77–14–4 examination. With this conclusion, however, we clarify that we are not finding that defendants have waived their rights against self-incrimination by relying upon the insanity defense. We simply hold that a "fair state-individual balance" requires this practical limitation on the privilege. *See* LaFave, at 349–50 (citing *United States v. Bohle*, 445 F.2d 54 (7th Cir.1971), *overruled by United States v. Lawson*, 653 F.2d 299, 301 (7th Cir.1981)).

*VIII. Cruel and Unusual Punishment*

Defendants next argue that the mens rea model imposes punishment upon those who do not appreciate the wrongfulness of their conduct or cannot conform their conduct to the requirements of law. The model, they continue, therefore violates the restrictions against cruel and unusual punishment of both the state and federal constitutions. *See* U.S. Const. amend. VIII; Utah Const. art. I, § 9.

 We do not reach this issue. This is an interlocutory appeal. Neither defendant has been convicted of a crime, let alone sentenced.[8] At this early point, there has been no adjudication of either defendant's mental status. This court will not issue advisory opinions or examine a controversy that has not yet

sharpened into an actual or imminent clash of legal rights and obligations between the

parties thereto. Where there exists no more than a difference of opinion regarding the hypothetical application of a piece of legislation to a situation in which the parties might, at some future time, find themselves, the question is unripe for adjudication.

*Redwood Gym*, 624 P.2d at 1148.

## CONCLUSION

We affirm the trial courts' orders denying defendants' motions to "Declare Utah Statutory Scheme Unconstitutional," and we remand both cases for trial.

ZIMMERMAN, C.J., and RUSSON, J., concur.

STEWART, Associate Chief Justice, dissenting:

Justice Felix Frankfurter of the United States Supreme Court wrote:

> Ever since our ancestral common law emerged out of the darkness of its early barbaric days, it has been a postulate of Western civilization that the taking of life by the hand of an insane person is not murder.

*United States v. Baldi*, 344 U.S. 561, 570, 73 S.Ct. 391, 396, 97 L.Ed. 549 (1953).

Today's majority opinion and the statute it sustains represent a monumental departure from, and rejection of, one of the most fundamental principles of Anglo–American criminal law that has existed for centuries. For the first time in this state's history and, with two exceptions, for the first time in the nation's history, this Court now holds that an insane person who commits an act prohibited by the criminal law is as guilty as a sane person and may be imprisoned, and even executed, as if he were a fully responsible sane person. I submit that the Court fails to

---

8. In their argument, defendants presume that they will be found guilty and mentally ill. Yet, there are several other possibilities:

If a defendant asserts a defense of not guilty by reason of insanity, the court shall instruct the jury that it may find the defendant:
 (1) guilty;
 (2) not guilty;
 (3) not guilty by reason of insanity;
 (4) guilty and mentally ill;
 (5) guilty of a lesser offense;
 (6) guilty of a lesser offense and mentally ill; or
 (7) guilty of a lesser offense due to mental illness, but not a mental illness that warrants full exoneration.

Utah Code Ann. § 77–16a–102 (Supp.1993).

perceive the extent to which fundamental constitutional principles and values have been violated by its affirmance of Utah Code Ann. § 76–2–305(1). The decision flouts centuries-old legal principles of personal responsibility that evolved from Judeo–Christian moral and ethical concepts and from an expanding knowledge of the causes of human behavior. Basic precepts of state and federal due process of law, equal protection of the law, and the cruel and unusual punishment provisions in the state and federal constitutions prohibit legislative action imposing such inhuman treatment on persons whose mental faculties are so deranged that rational, morally responsible conduct is not impossible.

The majority holds that Utah Code Ann. § 76–2–305 is constitutional on its face as against due process and equal protection claims; for inexplicable reasons, it refuses to decide whether the statute, on its face, violates the cruel and unusual punishment provisions of the state and federal constitutions because no trial has taken place, even though it finds that fact to be no impediment to deciding the due process and equal protection claims. If the first two issues are properly before the Court, so is the cruel and unusual punishment claim. I submit that § 76–2–305 violates all three provisions.

### I. NONISSUES

The majority suggests that the Legislature, in dealing with insanity, is confronted with a dilemma that demands a delicate balancing of the interests of society and the interest of an individual in justice and fairness. It states, " 'In a very real sense, the confinement of the insane is the punishment of the innocent; the release of the insane is the punishment of society.' " (Quoting *State v. Stacy,* 601 S.W.2d 696, 704 (Tenn.1980).) Certainly, the confinement of the insane is the punishment of the innocent, but it is simply not true that the criminal release of "the insane is the punishment of society." Every state, including Utah, provides for the civil commitment of insane persons who are dangerous to others, such as insane persons who have been found not guilty by reason of insanity.

The majority opinion also suggests that the issue is whether the M'Naghten insanity test is constitutionally required. Clearly, the constitution does not incorporate any particular formulation of an insanity defense. Nevertheless, recognition of insanity as a defense is a core principle that has been recognized for centuries by every civilized system of law in one form or another. Historically, the defense has been formulated differently, but given the extent of knowledge concerning principles of human nature at any given point in time, the essence of the defense, however formulated, has been that a defendant must have the mental capacity to know the nature of his act and that it was wrong. Whether the test has been termed the wild beast test, the M'Naghten test, the Durham test, the ALI test, the federal test, or some other test, it has always had at its core the proposition that those who are so mentally deranged as to lack the mental capacity to comply with the law are not subject to punishment under the criminal law for acts performed as a result of the derangement. Of course, it is up to the Legislature to fashion the scope of the defense, but it cannot, I submit, simply abolish it, as it has done here. There is therefore no issue, as the majority would have it, as to whether the "delicate balancing of public policy is better accomplished in the legislature than in the courts" with respect to the exact nature of the insanity defense. The Legislature has considerable latitude within constitutional limitations to adopt whatever insanity defense it deems wise, but it cannot, in my view, simply abolish it.

### II. SECTION 76–2–305(1) ABOLISHES THE INSANITY DEFENSE

To understand the radical change wrought in the law by § 76–2–305(1), it is necessary to outline the origins of the insanity defense. Beginning in the twelfth century as the criminal law began to move from a basis of strict liability to liability based on moral culpability, both insanity and self-defense came into English criminal law. Initially, neither insanity nor self-defense was a defense in a trial; indeed, trials then were not as we know them today. Insanity and self-defense were, however, the basis for a royal pardon.

*See* Francis B. Sayre, *Mens Rea,* 45 Harv. L.Rev. 974, 1004–05 (1932) [hereinafter *Mens Rea* ]. Insanity, self-defense, infancy, and other defenses based on the lack of a guilty mind became part of the substantive criminal law as defenses sometime after Bracton, but at an early date. *Id.* at 1004. The first recorded acquittal based on insanity was in 1505. Kathryn J. Fritz, Note, *The Proposed Insanity Defense: Should the Quality of Mercy Suffer for the Sake of Safety?,* 22 Am.Crim.L.Rev. 49, 50 n. 9 (1984) [hereinafter Note, *Insanity Defense* ]; *see also* AMA Report of the Board of Trustees, *Insanity Defense in Criminal Trials and Limitation of Psychiatric Testimony,* 251 JAMA 2967, 2975 (1984) [hereinafter AMA Report].

Evolution of the insanity defense and other exculpatory defenses into the common law from the twelfth century on was the result of the assimilation of the principles of canon law and Roman law, which helped transform the basis of the law from the blood feud and vengeance to principles based on moral blameworthiness. *Mens Rea,* at 975–82; Note, *Insanity Defense,* at 51. The concept of "mens rea" or the "guilty mind" or "wrongful intent" became an essential element of a crime. Whether stated as malice aforethought, premeditation, malice pretense, guilty mind, or wrongful intent, the guilty mind concept meant more than a simple volitional or intentional act. It included the element of wrongness or malice and required a degree of moral blameworthiness, and that required a capacity for rational conduct. It included a concept of "moral blameworthiness ... predicated on the presumption of sanity." *Mens Rea,* at 994.

In recent years, the Utah Legislature, in an effort to simplify the mental state requirement and eliminate some of the vagaries inherent in common law definitions of mens rea, such as malice aforethought, *see Mens Rea* at 996–98, provided that as to intentional acts, the mens rea was established simply by showing intentional or knowing conduct. Utah Code Ann. § 76–2–103. The traditional mens rea element of *wrongful* intent was, in

effect, surmised on the basis that a person is presumed to have knowledge of the law and that one knows the inherent moral wrongfulness of malum in se crimes.

With the enactment of § 76–2–305, the Legislature abolished a defendant's right to rebut this presumption by proving insanity. Subsections (1) and (4) of Utah Code Ann. § 76–2–305 state:

> (1) It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness is not otherwise a defense.
>
> . . . .
>
> (4) "Mental illness" means a mental disease or defect. A mental defect may be a congenital condition or one the result of injury or a residual effect of a physical or mental disease. Mental illness does not mean a personality or character disorder or abnormality manifested only by repeated criminal conduct.

On its face, the language in subsection (1) is misleading. The language stating that it is a "defense" that "the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged" seems to preserve the insanity defense. It does not. The statute allows a defendant to prove insanity only if it negates the requisite mental element of a crime.[1] But that only means that the elements of a crime must be proved. If they are not, there is no crime. If the elements of the crime are proved, the statute precludes proof that the defendant did not act with a wrongful intent because he did not have the capacity to know the nature, quality, or wrongfulness of his act. As to nonintentional crimes, those requiring proof of recklessness or negligence, for example, an insane defendant is held strictly liable for doing the act because he cannot, by definition, show that he acted as a reasonable person would have acted—the

---

1. The term "mental state" refers to the state of mind a person must have in committing an act for a crime to have been committed under the laws of this state. Utah Code Ann. § 76–2–103 defines the various mental states that must be proved in conjunction with an act to prove a crime. Acts that are done intentionally, knowingly, recklessly, or negligently may be criminal. Utah Code Ann. § 76–2–101.

standard objective test employed in such cases.

As to crimes requiring intent, an insane person will virtually always have the mental state required by the law under § 76-2-305(1), even though the defendant suffers from severe mental derangement, such as an extreme and bizarre psychotic delusion. In *United States v. Pohlot*, 827 F.2d 889 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988), the court stated:

> Only in the rare case, however, will even a legally insane defendant actually lack the requisite mens rea purely because of mental defect. As the House Report stated: "Mental illness rarely, if ever, renders a person incapable of understanding what he or she is doing. Mental illness does not, for example, alter the perception of shooting a person to that of shooting a tree." *House Report* at 15 n. 23. Similarly, a man who commits murder because he feels compelled by demons still possesses the mens rea required for murder.

*Id.* at 900.

The only two states that have adopted statutes similar to Utah's have acknowledged that those statutes abolish the insanity defense. In *State v. Rhoades*, 119 Idaho 594, 809 P.2d 455, 457 (1991), the Idaho Supreme Court stated, "The Idaho Legislature revised the criminal code to abolish the insanity defense in criminal cases." *See State v. Searcy*, 118 Idaho 632, 798 P.2d 914, 916–17 (1990). In *State v. Korell*, 213 Mont. 316, 690 P.2d 992, 997 (1984), the Montana Supreme Court stated, "Montana has abolished the traditional use of insanity as a defense." Section 76-2-305(1) has also abolished the insanity defense in Utah; however, as explained below, the Utah statutory scheme dealing with insane offenders is more inhumane and callous than the Idaho and Montana schemes.

## III. DUE PROCESS

Under the due process clauses of the Fourteenth Amendment to the Constitution of the United States and of article I, section 7 of the Utah Constitution, government may not deny a person life or liberty except on principles "consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Hebert v. Louisiana*, 272 U.S. 312, 316–17, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926). The due process clauses protect those principles that are "implicit in the concept of ordered liberty" and without which "a fair and enlightened system of justice would be impossible." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), *overruled on unrelated part*, *Benton v. Maryland*, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969).

The majority dismissively rejects the "historical argument that an affirmative independent insanity defense is so grounded in our legal system that its abolition offends our fundamental principles of law and justice and therefore violates due process." The majority argues that over the centuries, insanity has been dealt with procedurally and substantively in different ways. In truth, however, the majority simply fails to come to grips with the undisputed core fact that for centuries, the law has recognized that insanity absolves a human being of criminal responsibility for his acts, just as infancy and self-defense do. Of course, the insanity defense has evolved as moral and ethical sensitives have increased on the basis of increased scientific knowledge, but that does not alter the core fact that insanity has been a defense for centuries.

History demonstrates that the defense of insanity is essential to a fair and enlightened system of justice and that "[i]t is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane." *People v. Skinner*, 39 Cal.3d 765, 217 Cal.Rptr. 685, 688, 704 P.2d 752, 755 (1985). The "jurisprudential underpinnings" of mental nonresponsibility, or insanity, "reach back to the origins of Western ethical and legal thought." Am. Bar Assoc., ABA Criminal Justice Mental Health Standards 324 (1989) [hereinafter ABA Standards]; *see* 1 *Hawkins* 2 (1724–26); 4 William Blackstone, *Commentaries* 24–25

(1898);[2] 1 *Russell on Crimes* 9 (4th ed. 1865).[3] For hundreds of years, the common law has required that a defendant be morally culpable before he can be punished for a malum in se crime. *State v. Strasburg,* 60 Wash. 106, 110 P. 1020, 1022 (1910). As the ABA Standards explain:

As early as the sixth century B.C., commentary on the Hebrew scriptures distinguished between harmful acts traceable to fault and those that occur without fault. To these ancient scholars, the paradigm of the latter type of act was one committed by a child, who was seen as incapable of weighing the moral implications of personal behavior, even when willful; retarded and insane persons were likened to children. *See* Platt & Diamond, *The Origins and Development of the "Wild Beast" Concept of Mental Illness and Its Relation to Theories of Criminal Responsibility,* 1 J.Hist.Behav.Sci. 355, 366 (1965) [hereinafter cited as Platt & Diamond]. The Greek moral philosophers, at least as far back as fifth century B.C., considered the distinction between a culpable and nonculpable act to be among the "unwritten laws of nature supported by the universal moral sense of mankind." B. Jones, *The Law and Legal Theory of the Greeks* 264 (1956). The same view pervaded Roman law and appeared in the teaching of early Christian theologians. It emerged in Anglo–Saxon law no later than the twelfth century, the result of the "mutual influences and interaction of Christian theology and Anglo–Saxon law." Levitt, *The Origin of the Doctrine of Mens Rea,* 17 Ill.L.Rev. 117, 136 (1922). The idea was reinforced in England after the Norman invasion brought with it continental legal thought, itself strongly influenced by Christian ethics and canon law, which had already absorbed Jewish ethical teachings, classical philosophy, and Roman law. *See* Platt & Diamond, *supra,* at 356.

ABA Standards, at 324 n. 8.

For over four centuries, Anglo–American law has held that there can be no criminality when there is a total defect of understanding or a loss of the ability to comprehend reality. Long before the rise of psychiatry, the law so held. For there to be criminality, it has been necessary that there be at least some degree of rationality, making possible some degree of free choice. *Mens Rea,* at 1004.[4] The American Psychiatric Association has recognized that point:

Man is naturally endowed with these two great faculties, understanding and liberty of will.... The consent of the will is that which renders human actions either commendable or culpable.... [I]t follows that, where there is a total defect of the understanding, there is no free act of the will.

Am. Psychiatric Ass'n, *Statement on the Insanity Defense* 2 (Dec. 1982).

It is odd, indeed, that the Legislature and a majority of this Court would accept the deterministic theory of human nature that forms the basis for abolishing the insanity defense. The Court relies on the AMA Committee Report, which states:

By necessity, psychiatrists tend to view all human behavior as a product of deterministic influences. This deterministic orientation cannot be reconciled with the concept of free will; indeed, to a very great extent psychiatry denies the fundamental notion of individual responsibility that lies at the heart of the criminal law.

AMA Report, at 2978.

While that theory may be a useful assumption in the world of science, it contradicts the

---

**2.** Blackstone wrote:

But if there be any doubt whether the party be *compos* or not, this shall be tried by a jury. And if he be found, a total idiocy, or absolute insanity, excuses from the guilt, and of course from the punishment, of any criminal action committed under such deprivation of the sense....

4 William Blackstone, *Commentaries* 25 (1898).

**3.** Russell stated:

[W]ithout the consent of the *will,* human actions cannot be considered as culpable; nor where there is no will to commit an offence, is there any just reason why a party should incur the penalties of law made for the punishment of crimes and offenses.

1 *Russell On Crimes* 2 (4th ed. 1865).

**4.** For more modern statements of the proposition, see, e.g., *United States v. Currens,* 290 F.2d 751, 773 (3d Cir.1961); *Carter v. United States,* 252 F.2d 608, 616 (D.C.Cir.1957).

principles on which this nation and state were founded and on which the criminal law is based. The underlying premise of our political and legal institutions is that men and women are moral agents, free to choose between right and wrong. The Bill of Rights of the United States Constitution, the Declaration of Rights of the Utah Constitution, and the Declaration of Independence are all premised on that fundamental proposition, as is our criminal law. "Historically, our substantive criminal law is based upon a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong." *Morissette v. United States,* 342 U.S. 246, 250 n. 4, 72 S.Ct. 240, 244 n. 4, 96 L.Ed. 288 (1952) (quoting Pound, Introduction to Sayre, *Cases on Criminal Law* (1927)). It is for that reason that "[o]ur collective conscience does not allow punishment where it cannot impose blame." *Holloway v. United States,* 148 F.2d 665, 666–67 (D.C.Cir.1945), *cert. denied,* 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774 (1948).

In *Morissette,* the United States Supreme Court emphasized the universal essentiality in "all mature systems of law" of "the ancient requirement of a culpable state of mind":[5]

The contention that an injury can amount to a crime only when inflicted by intention [i.e., culpable mental state] is no provincial or transient notion. *It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of a normal individual to choose between good and evil.* A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution. *Unqualified acceptance of*

*this doctrine by English common law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will."* [4 Blackstone's Commentaries 21]. *Common-law commentators of the Nineteenth Century early pronounced the same principle, although a few exceptions not relevant to our present problem came to be recognized.*

342 U.S. at 250–51, 72 S.Ct. at 243–44 (emphasis added) (footnote omitted).

The majority opinion argues that moral culpability is established solely by an intent to kill a human being without regard for a defendant's insanity. The majority's attempt to justify abolition of the insanity defense by finding moral culpability solely on the basis of a defendant's intent, notwithstanding a defendant's insanity, is, I submit, moral nonsense. That argument, in effect, recognizes no difference between human beings and animals. On the Court's theory, an animal that intentionally kills its prey is guilty of wrongful conduct. The law does not now, and has not for centuries, premised criminality solely on an intent to commit a criminal act when extenuating circumstances justify or excuse the act and negate moral wrongfulness. Furthermore, the majority does not even address the question as to how it can justify holding an insane defendant liable for nonintentional conduct when there is no possibility of moral fault because the defendant is judged under a reasonable-person standard in cases involving reckless or negligent conduct.

The shocking consequence of today's ruling is that the state of Utah may subject persons who act as a result of insanity, whether temporary or permanent, whether curable or not, to capital punishment, minimum mandatory prison terms, and all other applicable criminal sanctions exactly as if the person were sane. It matters not whether the insanity is caused by a paranoid schizophrenic

---

**5.** For a brief treatment of the development of the concepts of free will and fault or criminal culpability in Biblical, Greek, Roman, Continental, and Anglo–American law, see Max Raydin, *Intent, Criminal,* 8 Encyclopedia Soc.Sci. 126 (1967). For an extensive treatment of the development in English law, see 2 Pollock & Maitland,

*History of English Law,* 448–511 (2d ed. 1923). For texts setting out the history of the insanity defense at common law, see Jodie English, *The Light Between Twilight and Dusk: Federal Criminal Law and the Volitional Insanity Defense,* 40 Hastings L.J. 1, 12 n. 54 (1988).

delusion, a degenerative brain disease such as Alzheimer's disease,[6] or an unexpected side effect of a prescription medication that gives rise to temporary insanity.[7]

In addition the majority's argument that intent alone is enough to show moral culpability is simply wrong. Under current law, intentional crimes committed by sane persons may be criminal or justifiable and noncriminal, depending on the degree of moral fault. For example, an infant is not criminally liable for any prohibited act, not even an intentional killing, for the reason that the infant simply lacks moral capacity and therefore lacks criminal capacity.[8] An adult who kills intentionally does not commit a criminal act if he acts in self-defense or in defense of others.[9] Likewise, a person's acts, though intentional and otherwise criminal, are not criminal if the act is done under duress,[10] in defense of habitation[11] or property,[12] or in effectuating an arrest.[13] And from very early territorial days until 1983, when the present statute was enacted, an act done by an insane person as a result of insanity was not criminal. 1888 Utah Comp. L. §§ 4387, 4388; 1898 Utah R.S. & 1907 Comp.L. §§ 4071, 4072.

Moreover, the whole structure of the criminal code calibrates crimes to varying degrees of moral fault, as well as to the nature of the act itself. The various degrees of homicide—aggravated homicide, second degree murder, manslaughter, and negligent homicide—are based on the degree of moral fault with which a defendant acts. Thus, an intentional murder may be (1) capital or aggravated homicide, Utah Code Ann. § 76–5–202; (2) second degree murder, § 76–5–203(1)(a); (3) manslaughter (extreme emotional disturbance and imperfect legal justification), § 76–5–203(1)(b)–(c); or (4) justifiable homicide, § 76–2–402(1), depending on circumstances bearing on the blameworthiness of the defendant's mind. Nonintentional killings are also graded according to the state of mind, or moral fault, with which a defendant acts. Nonintentional killing may be (1) second degree murder, i.e., a depraved indifference murder and felony murder, § 76–5–203(1)(c)–(d); (2) manslaughter (reckless conduct), § 76–5–205(1)(a); (3) negligent homicide, § 76–5–206; and (4) automobile homicide, § 76–5–207. In short, the degree of moral blameworthiness, based on a defendant's state of mind, determines whether a killing is criminal at all and, if it is, the degree of the crime and the severity of the

---

**6.** *See* Phillip A. Lesco, M.D., *Murder–Suicide in Alzheimer's Disease,* 37 J.Am.Geriatrics Soc. 167 (1989).

**7.** Unexpected side effects of prescription medications have apparently caused extraordinarily bizarre behaviors that can be corrected by a change of medications. In San Francisco, bite-sized pieces of flesh were found at the home of an 87–year–old woman who was being "cannibalized" by her 61–year–old daughter. The daughter had been taking the antidepressant Prozac. *Mom, 87, 'Cannibalized' by Daughter, Police Say,* Arizona Republic, Nov. 8, 1991, at A16.

**8.** Utah Code Ann. § 76–2–301 states, "A person is not criminally responsible for conduct performed before he reaches the age of fourteen years."

**9.** Utah Code Ann. § 76–2–402(1) states, "A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such force is necessary to defend himself or a third person...."

**10.** Utah Code Ann. § 76–2–302(1) states:

A person is not guilty of an offense when he engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would not have resisted.

**11.** Utah Code Ann. § 76–2–405(1) states, "A person is justified in using force against another when and to the extent that he reasonably believes that the force is necessary to prevent or terminate the other's unlawful entry into or attack upon his habitation."

**12.** Utah Code Ann. § 76–2–406 provides, "A person is justified in using force, other than deadly force, against another when and to the extent that he reasonably believes that force is necessary to prevent or terminate criminal interference with real or personal property...."

**13.** Utah Code Ann. § 76–2–403 provides, "Any person is justified in using any force, except deadly force, which he reasonably believes to be necessary to effect or to defend himself or another from bodily harm while making an arrest."

punishment. In large measure, the same is true of other crimes against persons and crimes against property.

The abolition of the insanity defense and the adoption of the "mens rea model," as Utah has done, was rejected by the Congress of the United States. After a jury found John Hinckley not guilty by reason of insanity of an attempted assassination of President Reagan, the United States Congress undertook reformation of federal insanity law.[14] The abolition approach was proposed and rejected after lengthy hearings in which numerous legal scholars, psychiatrists, and others testified, because Congress "'felt that concerns about the dangers of an insanity defense were overstated and because abolition *would alter that fundamental basis of Anglo–American criminal law: the existence of moral culpability as a prerequisite for punishment.' House Report at 7–8.*" *Pohlot,* 827 F.2d at 900 (emphasis added).

Construing the federal Insanity Defense Reform Act of 1984,[15] the Court of Appeals for the Tenth Circuit referred to the history of the insanity defense and its place in Anglo–American jurisprudence:

> Our criminal justice system punishes those it convicts for many reasons, chief among them being retribution against the criminal, deterrence of future crimes, and rehabilitation of the criminal. *See Kelly v. Robinson,* 479 U.S. 36, 49, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986). However, we hold accountable only those who are morally culpable for their conduct; historically we have not held "the very crazy" morally accountable for at least some of their actions. *See* Peter Arenella, *Convicting the Morally Blameless: Reassessing the Relationship Between Legal and Moral Ac-*

*countability,* 39 UCLA L.Rev. 1511, 1521 (1992); Stephen J. Morse, *Excusing the Crazy: The Insanity Defense Reconsidered,* 58 S.Cal.L.Rev. 777, 781 (1985) [hereinafter Morse]. In principle, the insanity defense can be traced back through at least 1,000 years of British law, and perhaps back as far as Roman, Christian, and Judaic law. . . .

> The point to be gleaned from this discussion is simple: Whatever the specific formulation of the defense has been throughout history, it has always been the case that the law has been loath to assign criminal responsibility to an actor who was unable, at the time he or she committed the crime, to know either what was being done or that it was wrong. This basic tenet has apparently been entirely unaffected by advances in medicine or psychology. *See* Michael L. Perlin, *Unpacking the Myths: The Symbolism Mythology in Insanity Defense Jurisprudence,* 40 Case W.Res. L.Rev. 599, 658–66 (1990) [hereinafter Perlin]. *As the first Justice Harlan noted nearly one hundred years ago, while one of the goals of the criminal justice system is to punish criminals and protect public safety, some "crimes of the most atrocious character" must not be the subject of criminal sanctions if the imposition of such sanctions would require the courts "to depart from principles fundamental in criminal law, and the recognition and enforcement of which are demanded by every consideration of humanity and justice."* Davis v. United States, 160 U.S. 469, 493, 16 S.Ct. 353, 360, 40 L.Ed. 499 (1895).

*United States v. Denny–Shaffer,* 2 F.3d 999, 1012 (1993).

---

**14.** It is noteworthy that John Hinckley was not turned loose by his acquittal but is still confined because of the mental disease that the jury found to have caused his criminal acts.

**15.** The federal insanity defense that was enacted by Congress is a variation of the M'Naghten test and is set out in 18 U.S.C. § 17:

(a) *Affirmative Defense.*—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect,

was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) *Burden of proof.*—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

In addition to placing the burden of proof by clear and convincing evidence on the defendant, the statute abolishes the volitional prong of the M'Naghten defense.

The abolition approach has not been adopted in any other jurisdiction except Idaho and Montana, and the schemes in those states are distinguishable from the Utah scheme. The abolition approach has also been rejected by the American Bar Association [16] and the American Psychiatric Association.[17] It was supported by the American Medical Association. The majority relies heavily on the AMA's deterministic, nonfree-will approach, which was designed to "correct the myopic focus of the insanity defense by emphasizing considerations of mercy and appropriate treatment for *all mentally disordered offenders*" (not just insane offenders).[18] In short, the AMA holds the stunning view that the law should provide treatment for *all* mentally disordered offenders, even though the disorder is much less severe than insanity and even though the disorder has no connection to the criminal act. Thus, the notion is that Utah should "mercifully" impose mental health treatment on all mentally ill criminals whether the mental illness has any relation to criminal conduct or not and insane persons should suffer the same penalties for their acts as sane persons, even death.

The federal cases the majority refers to do not support the constitutionality of a statute that abolishes the insanity defense; they simply deal with the right of the states to fashion the procedure for proving the content of the defense and the details of its substantive content. *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (constitutional under Fourteenth Amendment to place burden of proving insanity beyond a reasonable doubt on defendant). Not one of the cases cited deals with the right of the United States or of a state to abolish the defense of insanity. The majority's reliance on random statements made in a few concurring or dissenting opinions of two or three justices of the United States Supreme Court expressing doubt about the federal constitutional status of the insanity defense in cases having nothing to do with the issue are not based on any analysis of the law and fall far short of indicating how that Court would rule were it confronted with the issue. Furthermore, there is substantial federal law that looks the other way. In all events, a state supreme court has a duty to assess the issue under its own state constitution.

The majority relies heavily on the Montana and Idaho cases, *State v. Korell,* 213 Mont. 316, 690 P.2d 992, 1000 (1984), and *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990). They are distinguishable. The statutes in Montana and Idaho abolished insanity as an affirmative defense, as does Utah's, but unlike Utah, those states at least require an assessment of a defendant's mental culpability *as of the time of the crime* for the purpose of imposing a sentence. Indeed, *Korell,* which sustained the constitutionality of the Montana statute, indicated that a full assessment of the defendant's sanity and moral culpability was required before criminal sanctions could be imposed.[19] *Korell,* 690 P.2d at 996. The Montana Supreme Court sought to justify abolishing the insanity defense on the ground that the Montana legislature had adopted a guilty and mentally ill verdict which, unlike Utah's, requires the sentencing court to consider evidence of the defendant's mental condition and "[i]f the court finds that the defendant *at the time of the commission of the offense suffered from a mental disease or defect … any mandatory minimum sentence prescribed by law for the offense need not apply."* Mont.Code Ann. § 46–14–312(2) (emphasis added); *see Korell,* 690 P.2d at 996–97. Thus, a defendant's lack of moral culpability because of mental derangement when the crime was committed may result in no criminal punishment, although the defendant is still subjected to the stigma and other

---

**16.** *Criminal Justice Mental Health Standards* 260 (first tent. draft (1983)), *adapted in* 2 *Standards for Criminal Justice* ch. 7 (2d ed. 1986 Supp.); ABA Standards, 7–6.1 & commentary, at 336–38.

**17.** *American Psychiatric Association Statement on the Insanity Defense* 140 Am.J.Psychiatry 681, 683 (1983).

**18.** AMA Committee Report, *Insanity Defense in Criminal Trials and Limitation of Psychiatric Testimony,* 251 JAMA 2967, 2976 (1984) (emphasis added).

**19.** See also *State v. Byers,* 261 Mont. 17, 861 P.2d 860 (1993), which held that understanding right and wrong is not an aspect of the required mental state under Montana law.

disabilities of a criminal conviction. Utah provides no such procedure for assessing a defendant's sanity at the time of the crime.

The Idaho statutes establish a scheme similar to Montana's. In upholding Idaho's statute abolishing the defense, the Idaho Supreme Court referred to Idaho Code § 19–2523, which *"specifically requires the sentencing court to consider 'the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time of the offense charged.'"* *State v. Card,* 121 Idaho 425, 825 P.2d 1081, 1085 (1991) (emphasis added), *cert. denied,* —— U.S. ——, 113 S.Ct. 321, 121 L.Ed.2d 241 (1992). The Idaho Supreme Court stated that the procedure for assessing the moral culpability of a mentally ill offender at the time of the crime in the sentencing phase "provides the necessary safeguards" to prevent the Idaho scheme from offending constitutional principles of due process. *Id.,* 825 P.2d at 1086; *see* Idaho Code Ann. § 19–2523.

Regarding these statutory schemes, the AMA Report noted:

> Both the Montana and the Idaho statutes permit consideration of mental disease or defect as a factor in mitigation of punishment at the sentencing stage of the trial. Moreover, these statutes authorize the court to order treatment during the period of confinement or probation specified in the sentence if it concludes by clear and convincing evidence that the defendant suffers from a mental disease or defect that renders him unable "to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law," and that treatment is available and needed. Finally, they provide that mentally ill prisoners may be transferred to noncorrectional facilities for such treatment.

AMA Report, at 2975.

Although I do not believe that the Idaho and Montana schemes pass constitutional muster, there is nonetheless a difference between the Utah scheme and the Idaho and Montana schemes that is significant. The Idaho and Montana statutes require a defendant's mental illness at the time of the crime to be taken into account as a mitigating factor in imposing punishment; Utah's statute does not. Utah does not require a court at any time to assess a defendant's capacity to appreciate the wrongfulness of his conduct at the time of the crime. Thus, even though a defendant is starkly and bizarrely delusional at the time of the crime, that is not a mitigating factor in imposing sentence, except that in a capital case a jury might consider that factor in deciding whether to impose a life sentence rather than the death penalty. Although Utah has a guilty and mentally ill verdict, that verdict serves a different purpose than the Idaho and Montana guilty and mentally ill verdicts do. Utah's guilty and mentally ill verdict and a plea of guilty and mentally ill require a determination that the defendant was "mentally ill" *at the time of trial, not at the time of the crime.* Utah Code Ann. §§ 77–16a–103 to – 104. Mental capacity *at the time of the crime* is not relevant under Utah law. A defendant's lack of moral culpability at the time of the crime has no effect in either finding guilt or imposing sentence. In addition, the Utah statute is concerned only with "mental illness," not with insanity.

Utah Code Ann. § 77–16a–104(3) (Supp. 1993) makes explicit that mental condition is immaterial in sentencing: "If the court finds by clear and convincing evidence that the defendant is currently mentally ill, it *shall impose any sentence that could be imposed under law upon a defendant who is not mentally ill and who is convicted of the same offense."* (Emphasis added.) "[U]nder the Utah statute ... 'guilty and mentally ill' *focuses on the defendant's state of mind at the time of sentencing, regardless of his state of mind at the time of the crime"* and has no necessary causal relationship to the defendant's unlawful act and no bearing on the defendant's blameworthiness. *State v. Young,* 853 P.2d 327, 384 (Utah 1993) (quoting *Utah Legislative Survey—1983,* 1984 Utah L.Rev. 115). See also *State v. DePlonty,* 749 P.2d 621, 627 (Utah 1987), which stated "that committing a defendant who is guilty and mentally ill to the state mental

hospital" does not affect the length of the defendant's sentence, even though the defendant may have returned to normality. Mental illness is relevant only to whether the defendant should be given therapy for a maximum period of eighteen months or until he has reached the maximum benefit from the therapy. Thereafter, the defendant must serve out his prison sentence as any other defendant convicted of the same offense, regardless of whether he was capable of understanding the nature of his conduct at the time of the offense. *See* Utah Code Ann. § 77–16a–202(1)(a), (b); Utah Code Ann. § 77–16a–203.

In short, only in Utah is a defendant's insanity or moral nonresponsibility immaterial as to guilt and the sentence imposed, except that a sentencer may consider the defendant's insanity in the penalty phase of a capital case. No other common law jurisdiction has permitted the total elimination of insanity as a factor to be considered in criminal cases; no other court has ever held such a scheme constitutional. In Utah alone is a defendant's mental illness or insanity at the time of the crime neither an exculpating factor at the guilt phase nor even a mitigating factor at sentencing.

As science provides greater and greater knowledge as to how the brain functions, the issue at hand becomes all the more important. Increasingly, the causes of insanity are being identified. Clearly, insanity can be caused by loss of cognitive functions and volitional controls in various ways that are not delusional psychoses. For example, neurological degeneration and other types of impairment of the brain can present significant issues of moral culpability and legal insanity. Criminal acts can be caused by unexpected side effects of prescription drugs and by the aggressive and sometimes violent or kleptomaniac propensities of Alzheimer's patients that might well result in the imprisonment under the Utah scheme of persons whom everyone would agree are not morally blameworthy and whose imprisonment could only be cruel, if not barbaric.[20]

Three state supreme courts have squarely held statutes unconstitutional that sought to preclude a defendant from asserting a defense of insanity to a criminal charge at trial. In *State v. Lange*, 168 La. 958, 123 So. 639, 641–42 (1929), the Louisiana Supreme Court held that a statute which precluded a court from considering the insanity of a defendant violated that state's constitutional due process and right to jury trial provisions.

20. Alzheimer's disease inflicts 1.5 million Americans. Alzheimer's Disease and Related Disorders Assoc., Inc., Alzheimer's (1989). It is a dementing illness that causes cognitive dysfunction such as memory loss, loss of motor control, and systematized delusions and hallucinations, as well as behavioral disorders such as physical aggression, sleeplessness, increased confusion, and kleptomania. *See generally* J. Pierre Loebel & Adrian Leibovici, *The Management of Other Psychiatric States: Hallucinations, Delusions, and Other Disturbances*, 78 Med.Clinics of N.Am. 841 (1994) [hereinafter Loebel & Leibovici]; Linda Teri et al., *Behavioral Disturbance, Cognitive Dysfunction, and Functional Skill: Prevalence and Relationship in Alzheimer's Disease*, 37 J.Am.Geriatrics Soc. 109 (1989) [hereinafter Teri]. Behavioral aberrations are often manifestations of a loss of normal inhibitions.

"The behavio[r]al abnormality common to the aggressive manifestations in Alzheimer's may be described as an exaggerated impulsiveness ... that is, a deficit of the normal process by which the likely consequences of an action are continuously monitored and those judged to be unaccepted are inhibited." V.R. Pickles, *Neuroster-*

oids and Aggressive Behavior in Alzheimer's Disease, 42 Med.Hypotheses 243, 243 (1994). The immediate cause of this disinhibition is unknown but may be found in a hormonal imbalance in the cerebral cortex. *Id.* at 244.

Alzheimer's sufferers commonly manifest disinhibition in violence toward self or others, kleptomania, preoccupation with bodily functions, and exposing themselves to others. Loebel & Leibovici, at 842; Neil Kahn & Alan Stoudemire, *Behavioral and Pharmacologic Management of Patients with Alzheimer's Disease*, 79 J.Med.Assoc. of Georgia 287, 291 (1990). The behavioral disorders are not associated with the overall level of cognitive degeneration, at least in the mild and moderate stages of the disease. Teri, at 112–14; Loebel & Leibovici, at 841. Thus, an Alzheimer's patient may possess the required mental state to commit a crime but not be able to exercise the necessary judgment or discretion to be responsible for his actions.

For example, Judge John M. Wajert, 51, stepped down from the bench after eight years as a Pennsylvania judge. Two years later, he was arrested for embezzling $125,000 from clients. It was found that the former judge was suffering

*Sinclair v. State*, 161 Miss. 142, 132 So. 581, 582 (1931) (per curiam), held unconstitutional a state statute that abolished the affirmative defense of insanity in murder trials on the ground that the statute violated the state constitutional cruel and unusual punishment and due process provisions. Reviewing the legal history of the insanity defense in Anglo–American law, the Mississippi Supreme Court stated:

> [I]t is certainly shocking and inhuman to punish a person for an act when he does not have the capacity to know the act or to judge of its consequences. This has been the law throughout the history of this state, and the history of the English nation prior to the American Revolution. In other words, it has been the long-settled conviction of the people through every age of which we have any knowledge of the English thought and sentiment. All civilized nations have recognized that it was futile and useless to undertake to punish a person who is non compos mentis for any act either to restrain such person from committing another act of the same or similar kind, or to make him feel that respect for the law and for human society and welfare that a sane person should feel.

132 So. at 584 (Ethridge, J., lead opinion) (emphasis added). The court referred to the universality of the insanity defense and quoted *Smoot on Insanity:*

> "Insanity is considered, in the jurisprudence of all civilized nations, to be a defense against punishment for crime.... Animus involves an exercise of reasoning powers, in which the result of the criminal act is recognized as being contrary to the rules of law and justice.... So closely has the idea of insanity as a defense to crime been woven into the criminal jurisprudence of English speaking countries that it has become part of the fundamental laws thereof, to the extent that a statute which attempts to deprive a defendant of the right to plead it will be unconstitutional and void."

*Id.* at 584 (emphasis added) (quoting *Smoot on Insanity*, at 372).

The Washington Supreme Court in *State v. Strasburg*, 60 Wash. 106, 110 P. 1020, 1021 (1910), also held unconstitutional a statute banning evidence that a defendant was unable "by reason of his insanity, idiocy or imbecility, to comprehend the nature and quality of the act committed, or to understand that it was wrong." The court stated,

---

from Alzheimer's. He wore rumpled clothes, and he no longer shaved. During the seven-day trial, he slumped in a chair and stared vacantly at the floor. His defense counsel claimed that Wajert was unable to assist in his own defense, that Alzheimer's so impaired his client that the only thing the former judge could understand was that he needed money and so he took it, and that he was not able to exercise any kind of rational judgment. Wajert did not know of his degenerated condition, although his wife said: "He has been told repeatedly (about his affliction), and he doesn't remember. Why he said just the other day 'What do you suppose is the matter with me?'" *A Mind Undermined, When Did a Chesco Judge Accused of Embezzlement Become Ill?*, Philadelphia Inquirer, April 4, 1983, at B01. Because the judge knew that he was taking money, that knowledge was sufficient under Utah law to convict him of a crime, even though he lacked the mental capacity to understand the nature and consequences of his acts. His disinhibited urge to take the money was not unlike that of a child who grabs candy at the store without paying.

In addition, some form of aggression occurs in the course of illness in a significant number of demented patients. Loebel & Leibovici, at 846. Although medical research is finding physical explanations for this behavior, Loebel & Leibovici, at 844, such an affliction can have serious legal consequences. It is reported that when John Allen Borden was arrested on a murder charge, the Kansas City police did not question him about his guilt or innocence because no investigator thought he could understand. They knew that Borden probably would not remember the beating death of a fellow resident at a nursing home, whether he was the killer, or even what their questions were. Borden, 84, suffered from Alzheimer's. *Alzheimer's Victim Held in Slaying*, Kansas City Star, May 19, 1988, at 3. Even when their cognitive abilities are only mildly impaired, the moral judgment of such persons can be devastated.

Imprisonment imposed on such persons as Alzheimer's sufferers would certainly be barbaric and cruel. Criminal punishment cannot help these people and serves no legitimate penal purpose, yet, under Utah law, such persons would be subject to imprisonment and all other criminal sanctions.

*"[I]t seems too elementary to call for citation of authorities to show that the general rule is now and has been for centuries, at least in all common-law countries, that 'there can be no crime without a criminal intent.'"* 110 P. at 1024 (emphasis added) (quoting *State v. Constatine*, 43 Wash. 102, 86 P. 384, 384 (1906)). The court rejected the argument that the science of criminology had renounced the proposition of free will and held that the statute violated the state's constitutional clauses guaranteeing due process of law and the right to a trial by jury in criminal cases. 110 P. at 1025. In a concurring opinion, Chief Justice Rudkin stated, "For the first time in history, *so far as we are advised, the Legislature of a civilized state has attempted to place the idiot, who hath no understanding from his nativity, the imbecile and the insane, who have lost their understanding through disease or mental decay, and the sane man, in the full possession of all his mental faculties, on an equal footing before the criminal law.*" *Id.* at 1025–26 (Rudkin, C.J., concurring); *see also State v. White*, 60 Wash.2d 551, 374 P.2d 942, 965 (1962) (en banc) (stating that legislature's attempt to abolish insanity defense is unconstitutional), *cert. denied*, 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963).

In addition the California Supreme Court has recently held that a California statute dealing with the insanity defense had to be construed to provide for exculpation of one not morally responsible for his acts because it is "fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane." *People v. Skinner*, 39 Cal.3d 765, 217 Cal.Rptr. 685, 688, 704 P.2d 752, 755 (1985). The court stated:

> Because mens rea or wrongful intent is a fundamental aspect of criminal law, the suggestion that a defendant whose mental illness results in inability to appreciate that his act is wrongful could be punished by death or imprisonment raises serious questions of constitutional dimension under both the due process and cruel and unusual punishment provisions of the Constitution.

217 Cal.Rptr. at 690, 704 P.2d at 757; *see also State v. Joyner*, 225 Conn. 450, 625 A.2d 791, 800–01 (1993); *State v. Korell*, 213 Mont. 316, 690 P.2d 992, 998–99 (1984).

The majority asserts that *Lange, Sinclair,* and *Strasburg* are distinguishable because the statutes in those cases barred all evidence of insanity, whereas the Utah statute permits evidence of insanity insofar as it negates the required mental state in intent cases. That apparent difference is simply not a distinction. The evidence the statutes barred in those cases went to the affirmative defense of insanity. Here, if the State proves the prima facie elements of a crime, the defendant is also barred from asserting the affirmative defense of insanity? *Lange, Sinclair,* and *Strasburg* squarely hold that legislatures are prohibited under the due process clauses of state and federal constitutions from abolishing that defense. *Skinner* is to the same effect. Those cases stand squarely against the majority.

In sum, for centuries the concept of moral blameworthiness has been the foundation of the criminal law and that concept is equally essential to the law's legitimacy and its moral authority in a free society today. The criminal law represents the conscience of society. In declaring what is unlawful, it also declares what society deems to be morally abhorrent. If the criminal law does not serve that purpose but is used only as an instrument of social control not based on moral values, society's sense of right and wrong will surely dissipate even further, and the criminal law will eventually earn the scorn and disgust of society.

The concept of criminal responsibility based on moral blameworthiness is indispensable to the fair and just treatment of persons whose cognitive or neurological impairments render them unable to perceive and react to the real world as normal people. Punishing those who suffer from such impairments serves none of the recognized penal objectives. Society has ample means other than the criminal law for protecting itself from those whose insanity makes them dangerous. Although the definition of insanity

has varied over the centuries, the core principle that a civilized society does not punish insane people has not. That principle is one of those essential principles of fundamental fairness without which a "fair and enlightened system of justice would be impossible." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), *overruled on unrelated part, Benton v. Maryland*, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969).

I submit that § 76–2–305 is unconstitutional under the due process clauses of article I, section 7 of the Utah Declaration of Rights and the Fourteenth Amendment of the United States Constitution.[21]

## IV. EQUAL PROTECTION OF THE LAW

Under article I, section 24 of the Utah Constitution, the uniform operation of the laws provision, similarly situated persons must be treated similarly and dissimilarly situated persons must be treated dissimilarly. *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984); *see also Lee v. Gaufin*, 867 P.2d 572 (Utah 1993); *Greenwood v. City of North Salt Lake*, 817 P.2d 816, 820 (Utah 1991). In addition, the discrimination must substantially further a legitimate legislative purpose.

Under § 76–2–305, a defendant—no matter how insane, no matter how retarded, no matter how blameless from every moral or ethical point of view—is treated for guilt and punishment purposes as a human being with a brain that functions so that he knows and understands the real world and so that cognitive and volitional capacities permit him to react to the world as normal human beings react. Clearly, § 76–2–305 treats the sane and the insane as if they were similarly situated. The statute also discriminates among the insane on the basis of the content of their delusions. That discrimination is patently irrational and invidious. It serves no rational purpose. It has no rational connection to the protection of the public, which historically has been accomplished by civil confinement.

The majority argues that the discrimination is reasonable on the ground that the intent to do an act is sufficient to demonstrate moral culpability. The majority refers to an insane person who kills another by strangulation while thinking that he is only squeezing a grapefruit as an example that illustrates the rationality of the discrimination.[22] The majority's argument is that if a person strangles another, thinking that he is simply squeezing a grapefruit, the perpetrator is not morally culpable because he did not intend to kill another person. But if a defen-

---

21. There are in the law a few exceptions to the requirement that the criminal law should be based on moral culpability. Strict liability is imposed, for example, for regulatory-type crimes designed to ensure compliance with malum prohibitum offenses used to enforce various kinds of regulations. *See, e.g., United States v. Goodell*, 990 F.2d 497 (9th Cir.1993) (public safety); *Levas & Levas v. Village of Antioch*, 684 F.2d 446 (7th Cir.1982) (drug paraphernalia ordinance); *Watson Seafood & Poultry Co. v. George W. Thomas, Inc.*, 289 N.C. 7, 220 S.E.2d 536, 542 (1975) (traffic violations) (court refused to extend strict liability "to any crime involving moral delinquency"). The position that the due process clause requires a mens rea that includes an element of fault does not apply to the exception that has been made for regulatory-type criminal offenses. *See, e.g., United States v. Dotterweich*, 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (awareness of wrongdoing not necessary for conviction of violation of Federal Food, Drug & Cosmetics Act); *see also* LaFave & Scott, *Criminal Law* § 3.8(b) (2d ed. 1986). These crimes are usually punishable by fines.

22. In rejecting the argument that the mens rea, or abolition, model of insanity unconstitutionally discriminates against the criminally insane solely on the basis of the content of their delusions, the majority states:

> Defendants argue that Utah's mens rea model illegally differentiates between mentally ill defendants solely on the content of their delusions. One insane defendant may kill under the severe delusion that he is killing something that is not human. Another may kill under a delusion that he is being attacked and that his actions are justified as self-defense. The first is found not guilty by reason of insanity under the mens rea model, while the second may be convicted. According to defendants, each is equally mentally ill, but they are treated differently because some "clinically indistinguishable delusional system" causes them to have different hallucinations.
>
> We find that there is a reasonable basis for this difference and that the mens rea model is not arbitrary and capricious.

The majority opinion asserts that "the legislature has drawn a line between those who do not

dant kills another who he actually believes is trying to kill him because of a paranoid schizophrenic delusion, the defendant is morally and criminally culpable because he intended to kill a person, even though a sane person may kill in self-defense and not be guilty of a crime. The majority asserts that the Legislature could, with reason, have concluded that one who intends to kill a person in a delusional belief of self-defense is more culpable than one who strangles another in the delusional belief that he is merely squeezing a grapefruit.

The distinction is vacuous. It is capricious and arbitrary to make criminal culpability depend on the content of a delusion. Both persons are delusional, and if one were to judge both persons on the basis of their delusions and the criminal law as applied in the context of their delusions, neither would be guilty of a crime. Furthermore, a person who is so seriously deranged as to believe that he is squeezing a grapefruit or some inanimate object or animate object other than a human being when he strangles another is at least as dangerous to society as one who kills in the delusional belief that he is acting in self-defense. To acquit the first and find the second guilty of intentional killing and subject him to the same punishment as a sane person is irrational and invidiously discriminatory.

The statutory discrimination between sane persons and insane persons is also irrational. The defense of self-defense is a complete legal and moral justification for a sane person who kills another, even though the killing is intentional. That defense rests on the deeply rooted human instinct for self-preservation. Yet an insane person who acts under a compelling delusion that another is about to take his life and who, within the terms of the delusion, reasonably kills in self-defense, is punishable for intentional murder, even though the driving instinct that motivates the act is exactly the same as for a sane person. In that case, the law imposes criminal punishment simply for being insane, not for the act. That is not only a denial of equal protection, but also the infliction of cruel and unusual punishment in violation of the Eighth Amendment. *Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 1421, 8 L.Ed.2d 758 (1962) (it is cruel and unusual to punish one for an unavoidable status or condition, such as a sickness).

Furthermore, children under the age of fourteen are not subject to criminal sanctions at all. Historically, children under the age of seven and children between the ages of seven and fourteen who were not able to discern between right and wrong, and insane persons were held to lack criminal capacity for essentially similar reasons. A four-year-old who points a loaded gun, pulls the trigger, and kills another is not criminally punished because the law presumes that a child does not understand the nature or wrongfulness of the act due to his mental immaturity or incapacity. However, an insane person who suffers from the same inability to understand either the nature or the wrongfulness of his act is subject to punishment under § 76–2–305, not for culpable conduct, but for being insane, that is, for engaging in conduct he would not have engaged in but for his insanity.

The statutory discrimination between the insane and those who are not and between insane persons is invidious. In addition, the discriminations serve no legitimate purpose.

## V. CRUEL AND UNUSUAL PUNISHMENT

The majority does not address the constitutional claim that abolition of the insanity defense violates the cruel and unusual punishment clause. It asserts that the issue is not ripe for decision because no trial has taken place. Nevertheless, the majority addresses and decides the facial attack on the statute based on the due process and equal protection claims solely on the ground that defendants have been charged with felonies and have filed affidavits indicating an intent to assert insanity as a defense. The claim that the statute also offends the cruel and unusual punishment clauses of the Utah and United States Constitutions stands on exactly the same footing as the due process and

comprehend that they are taking a human life

and those who do."

equal protection claims that the Court has decided. It is both inconsistent and unjustified for the Court to refuse to decide the cruel and unusual punishment attack on the statute.

I submit that punishing a person for an act committed as the result of insanity is a gratuitous infliction of pain. It advances none of the objectives of the criminal law. It is the infliction of pain for an irrational reason and is cruel and unusual. The infliction of uncivilized and inhumane punishments is prohibited by the Eighth Amendment's cruel and unusual punishment provision. *Furman v. Georgia*, 408 U.S. 238, 268, 92 S.Ct. 2726, 2741, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); *Trop v. Dulles*, 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958). The Legislature's broad power to punish must be exercised within the limits of civilized standards. *Trop*, 356 U.S. at 100, 78 S.Ct. at 598. Punishment cannot be inflicted on the basis of a physical or mental condition of a person. *Robinson*, 370 U.S. at 667, 82 S.Ct. at 1421; *see Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); *Sinclair v. State*, 161 Miss. 142, 132 So. 581, 585–86 (1931). Criminal punishments must have some rough proportionality to the nature of the crime. *Solem v. Helm*, 463 U.S. 277, 285–90, 103 S.Ct. 3001, 3007–10, 77 L.Ed.2d 637 (1983). "Although the determination that a severe punishment is excessive may be grounded in a judgment that it is disproportionate to the crime, the more significant basis is that the punishment serves no penal purpose more effectively than a less severe punishment." *Furman*, 408 U.S. at 280, 92 S.Ct. at 2747 (Brennan, J., concurring) (footnote omitted).

The term "cruel and unusual punishment" takes meaning from what was considered to be cruel and unusual at the time the Bill of Rights was adopted. *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986). The United States Supreme Court has stated, "It was well settled at common law that ... 'lunatics' were not subject to punishment for criminal acts committed under [that] incapacit[y]." *Penry v.*

*Lynaugh*, 492 U.S. 302, 331, 109 S.Ct. 2934, 2953, 106 L.Ed.2d 256 (1989). Before the adoption of the United States Constitution, Sir Edward Coke noted that because punishing the mentally irresponsible serves no purpose, it is cruel and unusual. He stated, "[T]he execution of an offender is for example, ut poena ad paucos ad omnes perveniat (that the punishment may reach the few, but the fear of it affect all); but so it is not when a madman is executed; but should be a miserable spectacle, both against law, and of extreme inhumanity and cruelty, and can be no example to others." *Quoted in Sinclair*, 132 So. at 583–84 (Ethridge, J., lead opinion); *see also* LaFave & Scott, § 4.1(b)–(c), at 306. Blackstone, also before the adoption of the Constitution, took the same position. Justice William O. Douglas, in a concurring opinion in *Robinson*, wrote:

> The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the "cry of horror" against man's inhumanity to his fellow man....
>
> By the time of Coke, enlightenment was coming as respects the insane. Coke said that the execution of a madman "should be a miserable spectacle, both against law, and of extreme inhumanity and cruelty, and can be no example to others." 6 Coke's Third Inst. (4th ed. 1797, p. 6). Blackstone endorsed this view of Coke. 4 Commentaries (Lewis ed. 1897), p. 25.

*Robinson*, 370 U.S. at 676, 82 S.Ct. at 1425 (Douglas, J., concurring). Lord Hale wrote that punishing the insane was inhumane:

> [I]t is very difficult to define the invisible line that divides perfect and partial insanity; but it must rest upon circumstances duly to be weighed and considered both by the judge and jury, lest on the one side there be a kind of inhumanity towards the defects of human nature.

1 *Russell On Crimes* 9 (1865). The proposition that punishment of the insane is a "kind of inhumanity towards the defects of human nature" is as true today as it was on the day the concept was first embraced hundreds of years ago. " 'Obviously an insane person accused of crime would be inhumanely dealt with if his insanity were considered merely to reduce the degree of his crime or the punish-

ment therefor.'" *People v. Skinner*, 39 Cal.3d 765, 217 Cal.Rptr. 685, 691, 704 P.2d 752, 758 (1985) (quoting *People v. Coleman*, 20 Cal.2d 399, 407, 126 P.2d 349 (1942)).

Punishing the insane serves no legitimate penal purpose. Imposing retribution on insane persons is nothing more than a blind, atavistic vengeance. The insanity defense evolved to shield mentally nonresponsible persons from retribution precisely because they could not be blamed for what they had done. *Sinclair*, 132 So. at 584; LaFave & Scott, § 4.1(c), at 307. Furthermore, punishing the insane does not deter others from criminal conduct:

> "Nothing can more strongly illustrate the popular ignorance respecting insanity than the proposition, equally objectionable in its humanity and its logic, that the insane should be punished for criminal acts, in order to deter other insane persons from doing the same thing."

*Robinson*, 370 U.S. at 668, 82 S.Ct. at 1421 (Douglas, J., concurring) (quoting *Treatise on the Medical Jurisprudence of Insanity* 56 (5th ed. 1871)).

In a day when society is supposedly more enlightened and should be more sensitive to moral values and standards in the conduct of human affairs, it is ironic that the law should incorporate a policy of vengeance against those who cannot help their antisocial acts. It is even more ironic that this Court would find such a policy constitutional. I submit that abolition of the insanity defense is unconstitutional because it constitutes cruel and unusual punishment under both the United States and Utah Constitutions.

## CONCLUSION

I would hold Utah Code Ann. § 76-2-305 unconstitutional and reinstate the prior statute governing insanity in criminal cases until the Legislature decides to modify that standard.

I also concur in Justice DURHAM's dissenting opinion.

DURHAM, J., concurs in the dissenting opinion of STEWART, Associate C.J.

DURHAM, Justice, dissenting:

I respectfully dissent. The legislature, in abolishing the defense of insanity, has departed so far from fundamental and traditional notions of blameworthiness in the criminal law as to violate the prohibition against cruel and unusual punishment and the guarantee of due process of law contained in article I of the Utah Constitution.

In a thoughtful and lengthy article published in the *Utah Law Review*, Professor Martin Gardner reviewed the historical development of the concept of mens rea. The first paragraph of the article points out:

> Early in the English legal tradition, the idea arose that criminal liability entails some mental activity on the part of the offender relating to the proscribed conduct. By the time of Coke, the maxim *"actus non facit reum nisi mens sit rea"* (an act does not make one guilty unless his mind is guilty) had become well ingrained in the common law, and it remains a central precept of Anglo–American criminal law today.

Martin R. Gardner, *The Mens Rea Enigma: Observations on the Role of Motive in the Criminal Law Past and Present*, 1993 Utah L.Rev. 635, 636 (footnotes omitted).

The article goes on to document the ambiguity that surrounds the meaning and role of mens rea in the criminal law, articulating the problem in a helpful way for our purposes:

> [M]any puzzles have become clearer in light of the idea that *mens rea* is an ambiguous notion, sometimes used merely to describe the mental state which is required by the *definition* of a given crime, while at other times employed to express the principle that only the *morally culpable are justifiably punished.*

*Id.* at 639 (emphasis added) (footnotes omitted). The thesis is that the concept of mens rea evolved in the criminal law within two traditions. Originally, the focus of the law was on the notion of "evil motive," and criminal liability was not possible without affirmative proof. Under this view, certain defenses (such as duress and insanity) actually negated the general mens rea required for crimi-

nal liability, regardless of the nature of the specific crime.

> The modern practice, on the other hand, largely abandons the evil motive tradition *at the offense definition* level by defining the *mens rea* required for each crime descriptively in terms of particular states of mind. Most jurisdictions generally retain insanity, and duress as defenses. Proof of these defenses affords *excuses*, while theoretically leaving unchallenged the state's proof of the specific state of mind required as the *mens rea* element of the crime. Thus, current law embraces two levels of *mens rea*: One level requires proof of a specific state of mind; the other level affords excuses in certain situations, even though offenders act with the specific state of mind required for the crime, but either lack, or lack the capacity to form, the evil motive essential for moral blame.

*Id.* at 694–95 (emphasis added) (footnotes omitted).

Utah, in adopting the approach of the Model Penal Code, follows the modern practice of defining all crimes with mens rea elements, themselves in turn specifically described in terms of particular states of mind. What the legislature has attempted in section 76–2–305 is to eliminate from the criminal law a significant element of the doctrine of excuse—the notion that a total lack of moral culpability (because of insanity) properly prevents criminal punishment. If the legislature has the power to eliminate blameworthiness as a prerequisite for punishment in the context of insane persons, it may also abolish self-defense, mistake, duress, and infancy as excuses in the criminal law. It could, in fact, totally eliminate the concept of excuse as an element of criminal liability, thereby abandoning centuries of commitment in the western law tradition to the notions of "just deserts," proportionality, and fundamental fairness, a result that I doubt the majority could tolerate in constitutional terms. I am convinced that these notions have become irretrievably embedded in our understanding of due process and that article I, section 7 of the Utah Constitution precludes abandoning them. Furthermore, permitting the imposition of criminal sanctions, including the death penalty, on persons who cannot be considered morally culpable or deserving of blame for their acts constitutes "cruel and unusual punishment" within the meaning of article I, section 9 of the Utah Constitution.[1]

Because this case is being decided in virtually abstract terms, it is important to keep in mind exactly what the statute in question permits. The majority opinion accurately points out that

> if A kills B, thinking that he is merely squeezing a grapefruit, A does not have the requisite mens rea for murder and would be acquitted.... However if A kills B, thinking that B is an enemy soldier [or the devil, a Martian, or an evil spirit bent on destruction] and that the killing is justified ..., then A has the requisite mens rea for murder and could be convicted under the new law but not under the prior law, because he knowingly and intentionally took another's life.

Thus, only the nature of an insane person's delusional system distinguishes those we may punish from those we may not—someone who thinks that human beings are pieces of fruit is not morally blameworthy, but someone who thinks that they are devils, ghosts, spirits, or destructive enemies is. The distinction is irrational and has no theoretical legitimacy. It cannot be justified on any of the underlying bases of our criminal jurisprudence.

The traditional justifications for punishment in the criminal law include retribution,

---

1. This perception is a long-standing one in Utah law. In *State v. Brown*, 36 Utah 46, 57, 102 P. 641, 645 (1909), this court said:
 The true test is whether the defendant at the time of the commission of the offense, had the mental capacity to know that in doing the act he was doing wrong.
 *Id.* The court also quoted with approval the following language from the Nebraska Supreme Court:

 "[W]here an individual lacks the mental capacity to distinguish right from wrong, in reference to the particular act complained of, the law will not hold him responsible."
 *Id.* (quoting *Hawe v. State*, 11 Neb. 537, 538, 10 N.W. 452, 453 (1881)). The court announced, in the context of this understanding of the meaning of insanity, that "[a]n insane person cannot legally be guilty of criminal intent." *Brown*, 36 Utah at 58, 102 P. at 645.

incapacitation, deterrence, and rehabilitation.[2] Retribution coincides with the theory of just deserts and incorporates the fundamental notion that wrongdoers should *deserve* the penal consequences of their acts. But a person incapable of forming the general mens rea to do wrong cannot be said to deserve to be blamed:

> [S]ome mentally disordered persons can be treated justly only by a criminal system that has a defense of insanity. A person who kills because of a delusional belief that to do so will produce peace on earth, kills intentionally and probably premeditatedly and has no defense but insanity to a murder charge. Nevertheless, the killing is fundamentally irrational; the person is apparently incapable of behaving rationally in the context in which the delusion operates. A person who kills because of the delusional belief that it is necessary to do so to save one's own life kills intentionally and will not succeed with the defense of self-defense. That person may be guilty only of negligent or reckless homicide, but *such a verdict is not responsive to the moral character of the killing.* Such a person is not properly viewed as a negligent or reckless killer who should be convicted of a risk-creation type of homicide, but is rather a crazy actor who ought to be excused. *The immorality of convicting such persons of some degree of homicide can be avoided only by an insanity defense....*

Stephen J. Morse, *Excusing the Crazy: The Insanity Defense Reconsidered,* 58 So.Cal. L.Rev. 777, 802 (1985) (emphasis added) [hereinafter Morse].

Likewise, with respect to notions of incapacitation and deterrence, there is no rational basis for distinguishing between delusions; the person who strangles or shoots what he believes is a piece of fruit is no less dangerous to his (actually human) victim than one who kills to bring about world peace. Nor is either killer capable of being deterred by the availability of punishment. Finally, neither type of killer is inherently more amenable to rehabilitative efforts than the other. The killer who kills for peace may be equally or more susceptible to treatment than the "grapefruit killer," depending on the source and cause of their respective delusions. Thus, no moral or jurisprudential basis remains for punishing one type of insane person but not the other.

The majority opinion relies on the endorsement of section 76-2-305's approach by "credible branches in the scientific and medical fields," citing the position of the American Medical Association in a 1984 report. I submit that the analysis contained in the AMA report is basically wrong. As one commentary points out, "[T]he AMA believes that the insanity defense confuses moral and legal concepts with medical concepts, but it is the AMA analysis that is guilty of this confusion." Morse, at 791. The commentary explains:

> The AMA correctly notes that free will cannot be explained in medical terms or identified medically, but this is entirely beside the point. Medical models cannot provide a "reliable measure of responsibility" because they are not meant to do so. The AMA errs by claiming that free will is the basis for responsibility and that mental disorder is somehow necessarily the antithesis of free will. *Free will is not the basis for responsibility, and mental disorder per se does not negate responsibility: irrationality or compulsion negate responsibility....* The AMA's confused argument entirely fails to undercut the moral basis for the insanity defense because it does not recognize and deal with the true criteria for excuse.

---

**2.** See, for example, Robert A. Pugsley, *Retributivism: A Just Basis for Criminal Sentences,* 7 Hofstra L.Rev. 379 (1979):

> There are four commonly accepted goals of criminal punishment: Retribution, deterrence, rehabilitation, and incapacitation/isolation. However, only retributivism contains a valid philosophical premise upon which a coherent, organized system of just punishment can be built. It is the sole penal rationale concerned

exclusively with doing justice. A retributive punishment scheme is not inherently incompatible with other enumerated penal goals. Indeed, any incidental deterrent, rehabilitative, or preventive effects which result from just punishment are certainly welcome. However, these additional social-utilitarian goals cannot morally *justify* the imposition of criminal sanctions.

*Id.* at 381 (footnotes omitted).

*Id.* at 791–92 (emphasis added) (footnotes omitted).

The majority opinion fails to deal adequately with the admittedly difficult distinction referred to earlier—between mens rea as describing the mental state required by the definition of a given crime and mens rea as expressing the principle that only the morally culpable are justifiably punished. The opinion asserts, for example:

> The legislature has drawn a line between those who do not comprehend that they are taking a human life and those who do. *The offenders in the first group do not* know that they are hurting or killing another person, while those in the second group do know. The first group makes no moral judgment, while the second group realizes that they are actually killing someone and therefore their actions come closer to the realm of criminality.

This is sophistry. It is not considered immoral or criminal to kill an enemy soldier in time of war or to kill in self defense or to harm another under extreme duress. The law recognizes, through doctrines of excuse, that some killings are not criminal, and a person suffering from delusions who believes his killing to be excused by the law simply cannot "come closer to the realm of criminality," by which I understand the majority to mean some sort of culpability or blameworthiness. The majority's "second group" of killers makes no more of a "moral judgment" than the first. The whole point is that because of their mental condition, they are *incapable of recognizing that any moral choice presents itself:*

> [S]everely diminished rationality preclude[s] responsibility ... because our notions of who is eligible to be held morally responsible depend on our ability to make our *rather regularly practical syllogisms* for actions. One is a moral agent only if one is a rational agent. Only if we can see another being as one who acts to achieve some rational end in light of some rational

beliefs will we understand him in the same fundamental way that we understand ourselves and our fellow persons in everyday life. We regard as moral agents only those beings we can understand in this way.

M. Moore, *Law and Psychiatry* 244–45 (1984), *cited in* Sanford H. Kadish, *Excusing Crime,* 75 Cal.L.Rev. 257, 280 (1987).

Professor Kadish goes on to observe: "[S]een in this way, it is apparent why the excuse of legal insanity is fundamental. No blaming system would be coherent if it imposed blame without regard to moral agency." [3] *Id.*

These notions of fundamental coherence and fairness explain the historical development of the insanity defense from its earliest origins in the "evil motive" requirement to its modern usage as an affirmative doctrine of excuse. The legislature's effort to reverse this history permits punishment (including the death penalty) of persons who cannot be said to be blameworthy. That result constitutes a breach of the guarantees of fundamental fairness protected by the due process clause of our state constitution and the imposition of cruel and unusual punishment, in the sense that it is *undeserved* punishment.

There is, I think, little question that the insanity defense in many of its present forms is subject to abuse and requires reform. I agree with Professor Morse, who concludes that "thorough substantive and procedural reforms can yield a limited but just insanity defense and that the moral imperative of the defense requires that we attempt reform." Morse, at 806. In the meantime, the constitution does not permit the imposition of criminal punishment on persons who are not morally responsible, and therefore not legitimately blameworthy, for their actions.

---

**3.** The United States Court of Appeals for the Tenth Circuit acknowledged the same fundamental principle in *United States v. Denny–Shaffer,* 2 F.3d 999 (10th Cir.1993):

> Whatever the specific formulation of the defense has been throughout history, it has al-

ways been the case that the law has been loath to assign criminal responsibility to an actor who was unable, at the time he or she committed the crime, to know *either* what was being done *or that it was wrong.*

*Id.* at 1012 (emphasis added).